No. 90,360

STATE OF KANSAS, *Appellee,* v. SCOTT E. SCHOONOVER,
*Appellant.*
(133 P.3d 48)

Opinion filed April 28, 2006.

*Patrick H. Dunn,* assistant appellate defender, argued the cause and was on the briefs for appellant.

*Ty Kaufman*, county attorney, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Scott E. Schoonover petitions for review of the Court of Appeals' decision to affirm his convictions on seven counts arising from the manufacture and possession of methamphetamine. Several of the issues which Schoonover raises relate to multiplicity, lesser included offenses, and double jeopardy. These arguments require us to examine our jurisprudence regarding multiplicity and determine whether the single act of violence/merger doctrine is the test to be applied to determine whether a defendant has been twice placed in jeopardy in violation of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. Schoonover also raises issues of multiple acts, search and seizure, and an issue of first impression for this court of whether a defendant can be guilty of possession of a controlled substance without the appropriate drug tax stamp if the defendant did not have actual possession for a sufficient period of time to allow an opportunity to obtain and affix the stamps.

## FACTS

Schoonover does not contest the facts as stated by the Court of Appeals.

"On May 11, 2001, at 8:30 p.m., Schoonover was found passed out in the driver's seat of a 1982 Ford Escort. The vehicle was setting in the roadway just past an intersection in rural McPherson County. The farmer who found Schoonover walked up near the driver's side door and tried to get his attention by yelling at him. The farmer was 5 feet from the vehicle when he tried to get Schoonover's attention; he never got any closer. When Schoonover did not respond, the farmer called EMS from his cell phone.

"Vicki Johnson, a volunteer with the Inman, Kansas, fire department responded to the scene. She observed Schoonover leaning back in the seat with his eyes closed. The engine was still running. When Johnson tried to wake Schoonover, she noticed that he had an open beer bottle between his legs. Johnson turned the engine off but was still unable to wake Schoonover.

"Next to arrive at the scene was Inman police officer Richard Langdon. Langdon testified that he arrived at the scene at approximately 8:35 p.m. Langdon

testified that he observed a cooler on the front floorboard, coffee filters in the front seat, and a Bud Ice long-neck beer bottle sitting between Schoonover's legs.

"Langdon removed the beer bottle and shouted at Schoonover, who awoke when he saw a police officer standing outside his vehicle. Schoonover was asked to exit the vehicle after attempting to reach under the seat. When Langdon opened the door of the vehicle he 'smelled a mild odor of ammonia.' At this time, Schoonover was placed under arrest for transporting an open container.

"After exiting the vehicle, Schoonover stated that he was cold and asked for his shirt which was located on the passenger seat of the vehicle. Langdon reached in through the open passenger window to retrieve the shirt and again smelled what he 'believed to be anhydrous ammonia' coming from the floorboard where the cooler was located.

"Langdon was very familiar with the smell of anhydrous ammonia because he 'deal[s] with it daily at the anhydrous Co-op station.' Langdon again smelled the anhydrous ammonia when he opened the passenger door to look for Schoonover's identification. This time the smell took his breath away and burned his eyes.

"Captain Hoffman of the McPherson Sheriff's Department arrived to take command of the scene. Hoffman was a 25-year veteran with specific training and experience with respect to drugs and the manufacture of methamphetamine. Hoffman testified that as he approached the driver's side of the vehicle he could smell anhydrous ammonia. When he walked around to the passenger side of the vehicle, he detected a 'very strong odor' of anhydrous ammonia. Inside the vehicle in plain view of Hoffman were coffee filters and Coleman fuel. Believing that the vehicle might be a 'meth lab,' Hoffman contacted Detective Frazier of the Mc-Pherson Sheriff's Department.

"When Frazier arrived at the scene, he noted the anhydrous ammonia smell coming from the vehicle. He also saw the coffee filters and Coleman fuel inside the car. Based upon these observations and his discussions with the officers at the scene, Frazier applied for and obtained a search warrant.

"The search of the vehicle resulted in the following discovery. The cooler contained a bag of ice, a canning jar with a light blue liquid and a white substance 1 inch deep in the bottom of the jar, a 3-quart insulated cooler with anhydrous ammonia located inside, and three bottles of Bud Ice beer. The brand of beer was identical to the opened beer found between Schoonover's legs.

"Next, a backpack was found in the back seat which contained a bag of rock salt, a 1-quart bottle of muriatic acid, a quart canning jar with coffee filters inside, three empty canning jars and lids, and an assortment of plastic spatulas and spoons. A continuing search of the car uncovered a pair of brown boots; each boot contained a pint bottle of gas line antifreeze. Two cans of Coleman fuel were found in the rear cargo area of the vehicle.

"Inside a duffle bag located on the back seat the following items were found: six lithium batteries, a twin beam scale, a glass Pyrex square bowl, a metal kitchen strainer, folding knives, a Zip-Loc bag with vegetation and seeds inside, two mixing spoons, two pairs of pliers, a pair of forceps, Zip-Loc bags, single-edge razor

blades, a razor blade scraper, a box of coffee filters, a coffee mill with a white powder inside, a drinking cup containing plastic bags and two white tablets, and a plastic bag containing red powder and a 'rocky substance.'

"Also found inside the vehicle were rolling papers, a plastic bag containing a 'green leafy substance,' a lithium battery, a box of coffee filters, and a brown pill bottle containing a white powder.

"Later testing revealed the following results: the brown pill bottle contained 27 grams of ephedrine or pseudoephedrine, the 'green leafy substance' was found to be marijuana, and the canning jar with the blue liquid and white substance was found to contain methamphetamine. The net weight of the methamphetamine was approximately 26 grams.

"Schoonover was charged in district court with numerous offenses, and his motion to suppress evidence was denied. Following a jury trial, Schoonover was found guilty of possession of ephedrine as a precursor drug, possession of anhydrous ammonia in an unapproved container, possession of drug paraphernalia with intent to manufacture, possession of marijuana, possession of methamphetamine, manufacture of methamphetamine, and possession of methamphetamine without the appropriate tax stamps. Schoonover received a controlling sentence of 158 months' imprisonment." *State v. Schoonover*, No. 90,360, unpublished opinion filed November 5, 2004.

## ISSUES PRESENTED

Schoonover petitioned for review and we granted his petition. We have reframed the issues he raises as: (1) Did the multiple convictions arising from the same course of conduct in obtaining the materials for and engaging in the various steps of manufacturing methamphetamine violate Schoonover's right to be protected from double jeopardy? (2) Are charges of possession of drug paraphernalia with intent to manufacture and possession of methamphetamine lesser included offenses of manufacture of methamphetamine? (3) Under the facts of the case, where there were multiple items of drug paraphernalia which could have supported the defendant's convictions but the jury was not given a multiple acts instruction, was the defendant's right to a unanimous verdict violated? (4) Did the evidence establish sufficient opportunity to affix a drug tax stamp? (5) Should the court have instructed the jury that the defendant must have had an opportunity to affix the drug tax stamp? (6) Were there material omissions in the affidavit for the search warrant which rendered the search unreasonable? (7) Was the search warrant issued by a neutral and detached mag-

istrate and was it valid? (8) Did the officers exceed the scope of the search warrant by seizing items not specifically listed in the warrant and opening a duffle bag? and (9) Was there cumulative error?

Schoonover did not seek review of the Court of Appeals' decision to vacate his sentence on the count of manufacturing methamphetamine, finding that *State v. McAdam*, 277 Kan. 136, 83 P.3d 161 (2004), applied. The Court of Appeals remanded for resentencing to a drug severity level 3 felony. That portion of the decision is not subject to our review.

## ANALYSIS

### *I. Double Jeopardy/Multiplicity*

The defendant's first argument is that many of his drug convictions are multiplicitous and therefore in violation of his right not to be held in double jeopardy for an offense. The Court of Appeals panel relied on *State v. Groves*, 278 Kan. 302, 305-08, 95 P.3d 95 (2004) (single act of violence paradigm concerning multiplicity unaffected by 1998 amendments to K.S.A. 21-3107), in holding that multiplicity claims must be analyzed under both the common-law elements test and the "single act/merger" test. *Schoonover*, slip op. at 9-10. The panel then found that none of the defendant's convictions were multiplicitous because the elements of the offenses were not the same and none of the offenses merged because different evidence supported each offense.

In arguing that the Court of Appeals erred in its analysis, Schoonover asserts a violation of his rights under both the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. Because there is some suggestion in the Court of Appeals' analysis and the defendant's arguments that *Groves* provides broader protection than that afforded by the Fifth Amendment, we will discuss cases under both the federal and state Constitutions. Under both lines of cases, the issue of whether convictions are multiplicitous is a question of law subject to unlimited review. *Missouri v. Hunter*, 459 U.S. 359, 368, 74 L. Ed. 2d 535, 103 S. Ct. 673 (1983); *State v. Stevens*, 278 Kan. 441, 446, 101 P.3d 1190 (2004).

## A. Federal Analysis

The Double Jeopardy Clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The provision was made applicable to the States by the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 23 L. Ed. 2d 707, 89 S. Ct. 2056 (1969). This seemingly straightforward provision has created a body of case law which Justice (later, Chief Justice) William H. Rehnquist described as "a veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator." *Albernaz v. United States*, 450 U.S. 333, 343, 67 L. Ed. 2d 275, 101 S. Ct. 1137 (1981).

The first step in navigating the sea of case law is to determine which map or chart guides the analysis. In order to make this determination, the issue must be specifically stated in terms of the various categories utilized by the United States Supreme Court in its analysis of double jeopardy issues. This categorization assists in applying various rules developed by the court; some rules apply to all categories of fact patterns while others apply to only specific categories. Moreover, the treatment of cases within different categories has changed at various times, and to understand these changes one must recognize which line of cases applies. See Thomas, *A Unified Theory of Multiple Punishment*, 47 U. Pitt. L. Rev. 1 (1985).

*Categorization.* The categorization utilized by the United States Supreme Court is separated into two layers, each of which contains multiple categories classifying types of cases by issues and facts. At the first layer, the Court divides the protection created by the Double Jeopardy Clause of the Fifth Amendment into three broad categories, stating the clause protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 104 L. Ed. 2d 865, 109 S. Ct. 2201 (1989). This case raises double jeopardy concerns within the

context of multiple punishments for the same offense (sometimes referred to as cumulative punishment) and does not raise a question about a successive prosecution, either after an acquittal or a conviction.

The second layer focuses upon the issue of whether the prosecution is for the same offense. At this layer of analysis, it is recognized that a double jeopardy issue is not raised when a defendant is charged, tried, and sentenced for discrete and separate acts or courses of conduct. Rather the issue arises when the conduct is unitary, arising from what is usually referred to by the Court as "the same act or transaction" (*e.g., Blockburger v. United States,* 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 [1932]) or a "single course of conduct" (*e.g, United States v. Felix,* 503 U.S. 378, 389, 118 L. Ed. 2d 25, 112 S. Ct. 1377 [1992]). At this second layer focusing upon what constitutes a "same offense," cases are divided into two categories. In one, the defendant is charged with violations of multiple statutes that may or may not be deemed the same offense for double jeopardy purposes. See, *e.g., Gore v. United States,* 357 U.S. 386, 2 L. Ed. 2d 1405, 78 S. Ct. 1280 (1958) (defendant sentenced consecutively on three different drug charges for a single sale of narcotics). For ease of reference, these cases will be referred to as multiple description cases. In the second category, the defendant is charged with multiple violations of the same statute. See, *e.g., Ebeling v. Morgan,* 237 U.S. 625, 59 L. Ed. 1151, 35 S. Ct. 710 (1915) (upholding six convictions of defendant based upon defendant's cutting into six mail bags in a single transaction because Congress intended punishment for each act of damage to a mail bag); *Bell v. United States,* 349 U.S. 81, 99 L. Ed. 905, 75 S. Ct. 620 (1955) (under the Mann Act transporting two women in a single transaction across state lines for immoral purposes is one offense, not two); *In re Snow,* 120 U.S. 274, 30 L. Ed. 658, 7 S. Ct. 556 (1887) (continuous 35-month period of cohabitation is one offense because Congress did not create a temporal dimension to the offense). The sole issue in these cases is identification of the "allowable unit of prosecution." *United States v. Universal C.I.T. Credit Corp,* 344 U.S. 218, 221, 97 L. Ed. 260, 73 S. Ct. 227 (1952).

*Same Offense.* Even though this case does not raise a successive prosecution issue, it is helpful to briefly examine the United States Supreme Court's analysis of the Double Jeopardy Clause in the context of successive prosecutions because these cases clarify that the Fifth Amendment's prohibition against multiple prosecution and punishment for the "same offence" is a different concept from a prohibition against multiple prosecution or punishment for the "same conduct." The distinction was emphasized in *United States v. Dixon,* 509 U.S. 688, 125 L. Ed. 2d 556, 113 S. Ct. 2849 (1993), which overruled *Grady v. Corbin,* 495 U.S. 508, 521, 109 L. Ed. 2d 548, 110 S. Ct. 2084 (1990). In *Grady,* the Court held successive prosecution is prohibited under the Double Jeopardy Clause "if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." 495 U.S. at 510. Three years later, the Court in *Dixon* rejected this "same conduct" test. 509 U.S. at 711. Justice Scalia, who authored the opinion in *Dixon,* had written in his dissent in *Grady*:

"If the Double Jeopardy Clause guaranteed the right not to be twice put in jeopardy for the same conduct, it would bar this second prosecution. But that Clause guarantees only the right not to be twice put in jeopardy for the same *offense,* and has been interpreted since its inception, as was its common-law antecedent, to permit a prosecution based upon the same acts but for a different crime." 495 U.S. at 526 (Scalia, J., dissenting).

In *Dixon,* the Court, in a sharply divided opinion, adopted Justice Scalia's reading of the Fifth Amendment, noting that the "same conduct" test was "wholly inconsistent with earlier Supreme Court precedent and with the clear common-law understanding of double jeopardy" (509 U.S. at 704); "was not only wrong in principle[,] it had already proved unstable in application" (509 U.S. at 709); was "a continuing source of confusion" (509 U.S. at 710); and "was a mistake" (509 U.S. at 711). The Court discussed several cases to illustrate the instability and other problems created by the *Grady* holding. Of these several intervening decisions, we mention *Felix,* 503 U.S. 378, because it dealt with a charge of conspiracy to manufacture methamphetamine, a charge which is not present in this case but which raises a similar factual situation. In *Felix,* which was

decided less than 2 years after *Grady,* the Court was "forced to recognize a large exception to" *Grady. Dixon,* 509 U.S. at 709. Felix was charged with conspiracy to manufacture, possess, and distribute methamphetamine. The overt acts toward the conspiracy were the same acts that had supported substantive drug counts in another prosecution against the defendant. Felix argued the second prosecution was barred because it involved proof through the same evidence as used in the prior prosecution; he argued a "same evidence" test had been adopted in *Grady.* The *Felix* Court rejected that argument, stating: "[O]ur precedents hold that a mere overlap in proof between two prosecutions does not establish a double jeopardy violation." 503 U.S. at 386. The Court further concluded that a subsequent prosecution for conspiracy to manufacture, possess, and distribute methamphetamine was not barred by a previous conviction for attempt to manufacture the same substance. The Court "offered as a justification for avoiding a 'literal' (*i.e,* faithful) reading of *Grady* 'longstanding authority' to the effect that prosecution for conspiracy is not precluded by prior prosecution for the substantive crime." *Dixon,* 509 U.S. at 709; see *Felix,* 503 U.S. at 389 ("[L]ong antedating any of these cases, and not questioned in any of them, is the rule that a substantive crime and a conspiracy to commit that crime are not the 'same offence' for double jeopardy purposes.").

Based upon the review of *Felix* and other precedent with which *Grady* was in conflict and because of the confusion and instability the "same conduct" test had caused, the *Dixon* Court rejected further use of the "same conduct" test and determined that the test to be applied in successive prosecution cases would be the same test as that which has historically been applied in multiple description cases.

*Multiple Description Cases.* The test which has been applied since 1932 in multiple description cases is commonly referred to as the *Blockburger* or the elements test. As stated in *Blockburger,* the test provides: "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact the other does not.

[Citation omitted.]" 284 U.S. at 304. The first portion of the test—"where the same act or transaction constitutes a violation"—indicates the conduct must be unitary. Thus, a "same conduct" inquiry still applies. However, the "same conduct" inquiry does not determine whether there *is* a double jeopardy violation; rather it determines if there *could be* a violation. The determination of whether there is a violation depends upon "whether each provision requires proof of a fact that the other does not." 284 U.S. at 304.

The use of the phrase "proof of fact" in this inquiry raised uncertainty about the proper scope of the *Blockburger* test, specifically whether it required examination of facts. (As will later be discussed, this uncertainty undoubtedly spilled over into Kansas cases.) However, later cases have clarified that the proper inquiry focuses upon the elements of the statutes in question. For example, in a case cited by Schoonover, *Brown v. Ohio*, 432 U.S. 161, 166, 53 L. Ed. 2d 187, 97 S. Ct. 221 (1977), the Court stated: "This test emphasizes the elements of the two crimes." Later, the Court clarified: "The same-elements test, sometimes referred to as the '*Blockburger*' test, inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *Dixon*, 509 U.S. at 696.

Under the test, the evidence and proof offered at trial are immaterial. "Commentators and judges alike have referred to the *Blockburger* test as a 'same evidence' test. [Citations omitted.] This is a misnomer. The *Blockburger* test has nothing to do with the *evidence* presented at trial. It is concerned solely with the statutory elements of the offenses charged." *Grady*, 495 U.S. at 521 n.12.

The rationale for focusing upon the same elements is at least two-fold. First, such a test remains loyal to the constitutional language proscribing multiple punishment for the "same offence" and does not stray into a test not constitutionally stated, *i.e.*, one proscribing punishment for the "same conduct." *Dixon*, 509 U.S. at 704. Second, the test maintains the appropriate separation of powers. As stated by the Court in *Whalen v. United States*, 445 U.S. 684, 689, 63 L. Ed. 2d 715, 100 S. Ct. 1432 (1980): "If a federal court exceeds its own authority by imposing multiple punishments

not authorized by Congress, it violates not only the specific guarantee against double jeopardy, but also the constitutional principle of separation of powers in a manner that trenches particularly harshly on individual liberty." The Court further explained this rationale in *Brown*:

"Because it was designed to embody the protection of the common-law pleas of former jeopardy [citation omitted], the Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial." 432 U.S. at 165.

As this implies, the necessary corollary to the *Blockburger* test, at least when applied in a multiple description case, is a focus upon legislative intent. The United States Supreme Court has stated that if the legislature has explicitly authorized multiple punishment, the judicial inquiry is at an end; multiple punishment is authorized and proper. This is illustrated by *Albernaz v. United States*, 450 U.S. 333, 67 L. Ed. 2d 275, 101 S. Ct. 1137 (1981), in which the Court addressed the issue of whether a defendant could be cumulatively punished in a single trial for conspiracy to import marijuana and conspiracy to distribute marijuana. The Court concluded that the two statutes did not proscribe the "same" offense in the sense that " 'each provision requires proof of a fact [that] the other does not.' " 450 U.S. at 339 (quoting *Blockburger*, 284 U.S. at 304). However, the Court did not end its analysis. Instead, it went on to state: "The *Blockburger* test is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." 450 U.S. at 340. The *Albernaz* Court examined the legislative history, finding nothing which disclosed "an intent contrary to the presumption which should be accorded to these statutes after application of the *Blockburger* test." 450 U.S. at 340. The Court then stated that "the question of what punishments are constitutionally permissible is no different from the question of what punishment the Legislative Branch intended to be imposed. Where Congress intended, as it

did here, to impose multiple punishments, imposition of such sentences does not violate the Constitution." 450 U.S. at 344.

Subsequently, in *Hunter*, 459 U.S. at 368-69, in considering whether the Double Jeopardy Clause was violated when a defendant was convicted of robbery and felony murder with robbery as the underlying felony, the Court stated that where

"a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger,* a court's task of statutory construction is at an end and the prosecution may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial."

In *Whalen*, the Court clarified that, as applied in the context of the cumulative punishment arising from violations of multiple statutes charged from the same conduct (multiple description cases), the *Blockburger* test is not a constitutional rule, but a canon of construction. 445 U.S. at 691. (In contrast, at least arguably, the *Blockburger* test is a constitutional principle in the context of multiple/successive prosecutions. Hoffheimer, *The Rise and Fall of Lesser Included Offenses*, 36 Rutgers L.J. 351, 401 [Winter 2005]. But see *Dixon,* 509 U.S. at 704 [Scalia, J.] [dicta suggesting no difference in treatment between these categories of cases]).

When applied as a canon of statutory construction, the Court explained, the "assumption underlying the [*Blockburger*] rule is that Congress *ordinarily* does not intend to punish the same offense under two different statutes." 445 U.S. at 691-92. However, if a legislature enacts statutes which require different elements of proof, it may be inferred that the legislature intended to authorize separate application of each statute. Conversely, if one statute shares all of its elements with another (*i.e.*, it is a lesser included offense), then it can be assumed the legislature created a single offense which has alternative bases for prosecution. *Whalen,* 445 U.S. at 693-94; see, *e.g., Brown,* 432 U.S. at 167 (cited by Schoonover; holding the lesser offense of joyriding requires no proof beyond that required for a conviction for greater auto theft, making the offenses the same for purposes of double jeopardy).

Although the *Blockburger* test has been the primary canon of construction utilized to determine congressional intent in the mul-

tiple punishment context, the Court, although not explicitly stating a different test, has also examined the social evils sought to be addressed by each offense. See, *e.g.*, *United States v. Woodward*, 469 U.S. 105, 109, 83 L. Ed. 2d 518, 105 S. Ct. 611 (1985) (currency reporting and false statement statutes directed to separate evils); *Albernaz*, 450 U.S. at 343 (separate statutes proscribing conspiracy to import and to distribute marijuana are directed to separate evils). One commentator has suggested "[t]his method assumes that a legislature would intend statutes to apply separately only if each statute prohibits a distinctive evil." Thomas, 47 U. Pitt. L. Rev. at 29. Additionally, the Court has looked to the language, structure, and legislative history of statutes to determine legislative intent. *Garrett v. United States*, 471 U.S. 773, 779-86, 85 L. Ed. 2d 764, 105 S. Ct. 2407 (1985) (language, structure, and legislative history of the Comprehensive Drug Abuse Prevention and Control Act of 1970 show that Congress intended a continuing criminal enterprise offense to be a separate offense punishable in addition to the predicate offenses).

Another canon of statutory construction commonly applied in the criminal law context, the rule of lenity, has not been applied in the traditional manner in multiple description cases. The Court has invoked a presumption of lenity only under circumstances in which the statutes at issue, their legislative history, and their structure raise an implicit indication of lenity. Compare *Jeffers v. United States*, 432 U.S. 137, 156, 53 L. Ed. 2d 168, 97 S. Ct. 2207 (1977) (presumption of lenity arises after examination of legislative history and structure of statutes reveals an unrebutted indication of lenity) and *Prince v. United States*, 352 U.S. 322, 328-29, 1 L. Ed. 2d 370, 77 S. Ct. 403 (1957) (same) with *Gore*, 357 U.S. at 391 (Congress has manifested an attitude of harshness, not lenity). In contrast, the application of the rule of lenity to single-statute unit of prosecution cases is well established. See, *e.g.*, *Ladner v. United States*, 358 U.S. 169, 177, 3 L. Ed. 2d 199, 79 S. Ct. 209 (1958) (where two charges are brought based upon injuries to two persons caused by single discharge of gun, Court applies rule of lenity where congressional intent unclear).

For our purposes in this multiple description case, the Court's discussion in *Gore*, illustrates the contrast:

"This situation is *toto coelo* different from the one that led to our decision in *Bell v. United States*, 349 U.S. 81. That case involved application of the Mann Act-a single provision making it a crime to transport a woman in interstate commerce for purposes of prostitution. We held that the transportation of more than one woman as a single transaction is to be dealt with as a single offense, for the reason that when Congress has not explicitly stated what the unit of offense is, the doubt will be judicially resolved in favor of lenity. It is one thing for a single transaction to include several units relating to proscribed conduct under a single provision of a statute. It is a wholly different thing to evolve a rule of lenity for three violations of three separate offenses created by Congress at three different times, all to the end of dealing more and more strictly with, and seeking to throttle more and more by different legal devices, the traffic in narcotics. Both in the unfolding of the substantive provisions of law and in the scale of punishments, Congress has manifested an attitude not of lenity but of severity toward violation of the narcotics laws. [Citations omitted.]" 357 U.S. at 391.

Thus, according to the Court, the presumption of lenity does not arise as a presupposition of the constitutional proscription of multiple punishment in a single trial, but instead arises only after the language, structure, and legislative history of the statutes at issue raise an indication of leniency.

*Unit of Prosecution Cases.* In the second category of cumulative punishment cases, a double jeopardy issue arises when a defendant is convicted of multiple violations of a single statute. In such a case, the statutory definition of the crime determines the minimum scope of the conduct proscribed by the statute. The Court in *Universal C.I.T. Credit Corp.*, 344 U.S. at 221, referred to this as the "unit of prosecution." When the prosecution is based upon the same conduct, there can be only one conviction for that minimum unit of prosecution. The key to determining the minimum unit of prosecution is legislative intent. See *Ebeling*, 237 U.S. at 629 (allowing six counts when defendant cut six mail bags because "the language of the statute plainly indicates that it was the intention of the lawmakers to protect each and every mail bag from felonious injury and mutilation"); *Bell*, 349 U.S. 81 (under Mann Act Congress intended to punish for action not number of victims); *In re*

*Snow*, 120 U.S. 274 (Congress did not intend to break offense into temporal units); Thomas, 47 U. Pitt. L. Rev. at 55.

The determination of the appropriate unit of prosecution is not necessarily dependent upon whether there is a single physical action or a single victim. Rather, the key is the nature of the conduct proscribed. This concept is illustrated by the holding in *Universal C.I.T. Credit Corp.* The defendant violated the Fair Labor Standards Act through a managerial decision that certain activity did not require overtime payment. Even though there were multiple underpayments to multiple employees during multiple pay periods, the Court determined that Congress intended one punishment for the one managerial decision. 344 U.S. at 224. The unit of prosecution was determined by the scope of the course of conduct defined by the statute rather than the discrete physical acts making up that course of conduct or the number of victims injured by the conduct.

As has been discussed, in unit of prosecution cases the Court applies a rule of lenity. For example, in *Bell*, when left to discern whether Congress intended for the simultaneous transportation of two women across state lines to be one or two violations of the Mann Act, the Court stated: "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." 349 U.S. at 83. Although the Court noted that Congress could provide for there to be two convictions for the act, when it had failed to authorize that unit of conviction "clearly and without ambiguity" only one conviction would be allowed. 349 U.S. at 84.

In essence, if multiple convictions arise from violations of a single statute, the definition of the crime must be examined to determine the unit of conduct defined by the legislature. There can be only one conviction for that unit of conduct.

*Concurrent Sentences/Collateral Consequences.* The Double Jeopardy Clause is implicated in this case even though Schoonover was sentenced to concurrent sentences. As the United States Supreme Court stated in *Ball v. United States*, 470 U.S. 856, 865, 84 L. Ed. 2d 740, 105 S. Ct. 1668 (1985), "[t]he separate *conviction*, apart from the concurrent sentence, has potential adverse collateral

consequences that may not be ignored. . . . Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment" (noting effect of criminal history, potential impeachment of credibility, and societal stigma as collateral consequences of conviction). The same protection is provided under § 10 of the Kansas Constitution Bill of Rights. See *State v. Cady*, 254 Kan. 393, 396-97, 867 P.2d 270 (1994).

### B. Application of Federal Analysis in State Courts

In *Whalen*, the Court, in a footnote, addressed application of the Double Jeopardy Clause in state courts, stating:

"The Court has held that the doctrine of separation of powers embodied in the Federal Constitution is not mandatory on the States. [Citations omitted.] It is possible, therefore, that the Double Jeopardy Clause does not, through the Fourteenth Amendment, circumscribe the penal authority of state courts in the same manner that it limits the power of federal courts. The Due Process Clause of the Fourteenth Amendment, however, would presumably prohibit state courts from depriving persons of liberty or property as punishment for criminal conduct except to the extent authorized by state law." 445 U.S. at 689 n.4.

Other than this indication that the separation of powers rationale may not extend to cases dealing with state law, the Court has not deviated from its analysis when applying the Double Jeopardy Clause to state statutes. See, *e.g., Missouri v. Hunter,* 459 U.S. 359; *Brown v. Ohio,* 432 U.S. 161.

Thus, under a Fifth Amendment analysis, we must examine legislative intent and apply the same-elements test when multiple description crimes are at issue and examine legislative intent to determine the minimum scope of the unit of prosecution when multiple counts based upon a single statute are at issue. Before examining the specifics of the charges against Schoonover, we will examine whether the same analysis applies under Kansas case law.

### C. Kansas Cases

Section 10 of the Kansas Constitution Bill of Rights provides: "No person shall . . . be twice put in jeopardy for the same offense." Comparing this provision to the Fifth Amendment, we have stated:

"The language of § 10 of the Kansas Constitution Bill of Rights is very similar to the language contained in the Fifth Amendment to the United States Constitution. Both provide in effect that no person shall be twice placed in jeopardy for the same offense. The language of the Fifth Amendment guarantees no greater protection to an accused than does § 10 of the Kansas Constitution Bill of Rights. Therefore, the underlying protection in the Double Jeopardy Clause of the United States Constitution is contained in § 10 of the Kansas Bill of Rights." *State v. Cady,* 254 Kan. at 396-97.

In *Cady,* the court cited to *Brown v. Ohio* in listing the three categories of protection from (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. 254 Kan. at 396 (citing 432 U.S. at 165). Kansas has also followed the United States Supreme Court's analysis by examining whether conduct is unified or unitary. *E.g., State v. Smallwood,* 264 Kan. 69, 92, 955 P.2d 1209 (1998) (time, distance, and causal relationship to be considered in determining whether crimes merge); *State v. Garnes,* 229 Kan. 368, 373, 624 P.2d 448 (1981) (offenses "committed separately and severally, at different times and different places, . . . cannot be said to arise out of a single wrongful act"). Thus, in general, Kansas has utilized the same categories for analysis as has the United States Supreme Court.

We have also stated: "Section 10 of the Bill of Rights of the Kansas Constitution entitles a defendant to the same protections against double jeopardy afforded under the United States Constitution." *In re Habeas Corpus Petition of Lucas,* 246 Kan. 486, 489, 789 P.2d 1157 (1990).

Although we have not explicitly departed from this view and have never stated that the Kansas Constitution provides a broader protection than does the Fifth Amendment, the Court of Appeals, citing to *State v. Groves,* 278 Kan. 302, 95 P.3d 95 (2004), concluded:

"Apparently the common-law elements test is not the only test utilized by courts to determine the issue of multiplicity. Thus, we will analyze Schoonover's claims of multiplicity under both the common-law elements test and also the single act/merger test as set forth by the court in *Garcia,* [272 Kan. 140, 32 P.3d 188 (2001)] and *Groves.*" *Schoonover,* slip op. at 10.

Of these two tests, only the same-elements test is applied under a Fifth Amendment analysis.

### 1. Patten and the Same-Elements Test

Since oral arguments in this case, we decided *State v. Patten*, 280 Kan. 385, 122 P.3d 350 (2005), which held that the same-elements test would be applied in Kansas. The issue and the analysis were discussed in terms of whether the convictions were multiplicitous. As we explained:

" 'Multiplicity is the charging of a single offense in several counts of a complaint or information. The reason multiplicity must be considered is that it creates the *potential* for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights.' " (Emphasis added.) 280 Kan. at 388 (quoting *State v. Robbins*, 272 Kan. 158, 171, 32 P.3d 171 [2001]).

There are two "roots of multiplicity": (1) common-law and (2) K.S.A. 21-3107. *State v. Schuette*, 273 Kan. 593, 600-01, 44 P.3d 459 (2002). In *Schuette*, the court concluded "the present statutory language [K.S.A. 2001 Supp. 21-3107(2)(b)], in essence, mirrors the common-law elements test, thereby leaving it as the only remaining test for multiplicity." 273 Kan. at 601. *Patten*, after reviewing some intervening case law, also reached the conclusion that the same-elements test should be applied to multiplicity issues. The focus in *Patten* was upon the confusion caused by the terminology "proof of fact," confusion similar to that initially found in federal cases applying the *Blockburger* test. In *Patten*, we concluded that the proof of fact terminology had led parties to argue facts. 280 Kan. at 393. After discussing the confusion caused by an examination of facts and noting the lack of predictability that results, the court implicitly abrogated case law which had focused upon the facts that must be proven to establish those elements and held: "The test for multiplicity is the strict elements test without considering the facts that must be proven to establish those elements." 280 Kan. 385, Syl. ¶ 4.

However, the *Patten* decision did not explicitly analyze whether the single act of violence/merger doctrine, which was applied by

the Court of Appeals panel in this case and by this court in *Groves*, survives.

## 2. *Groves*

The analysis of the Court of Appeals panel in this case and the *Groves* decision attempt to reconcile two lines of decisions in Kansas. Under one, the cases hold that the common-law elements test is the only test to be applied. The second applies the concept of merger to cases arising from a single course of conduct or single act of conduct. *Groves*, 278 Kan. at 305-07. Both lines of cases are stated in terms of multiplicity.

In *Groves*, this court determined that the defendant's convictions for aggravated robbery and aggravated battery were multiplicitous because they arose from a single act of violence. The defendant, in one physical motion, grabbed a woman's purse and threw her to the ground causing great bodily injury.

This court's decision in *Groves* arose on review of a holding by a Court of Appeals panel that the convictions were multiplicitous. The panel noted the "impressive case precedent supporting Groves' claim of multiplicitous convictions." *State v. Groves*, 31 Kan. App. 2d 635, 636, 70 P.3d 717 (2003), *aff'd* 278 Kan. 302, 95 P.3d 95 (2003). The panel cited *State v. Warren*, 252 Kan. 169, 182, 843 P.2d 224 (1992) (aiding and abetting aggravated battery conviction was multiplicitous with aggravated robbery conviction where both counts charged participation in the act of knocking down an elderly woman to steal a purse), and *State v. Vontress*, 266 Kan. 248, 257, 970 P.2d 42 (1998) (aggravated robbery and aggravated battery convictions were multiplicitous where shooting of one of the victims was used to prove both crimes).

The Court of Appeals panel in *Groves* noted it was bound to follow this precedent. Additionally, it concluded that this court would not retreat from *Warren* and *Vontress* even though there had been indications otherwise.

"We acknowledge since *Warren* and *Vontress* were decided, K.S.A. 21-3107 has been amended to remove former K.S.A. 21-3107(2)(d). See L. 1998, ch. 185, § 1. The significance of that amendment was considered in *State v. Garcia*, 272 Kan. 140, 32 P.3d 188 (2001). In *Garcia*, the Supreme Court followed its decisions

in *Warren* and *Vontress* when it held the appellant's conviction for aggravated kidnapping was multiplicitous with either the rape or aggravated criminal sodomy convictions because 'the bodily harm needed to prove aggravated kidnapping was the same bodily harm supplied by one of the rape convictions or the aggravated criminal sodomy conviction.' 272 Kan. at 147. Although the court followed *Warren* and *Vontress*, it pointed out a change in the multiplicity analysis as a result of the revision of K.S.A. 21-3107:

'It should be noted that in 1998, the Kansas Legislature amended K.S.A. 21-3107 to essentially remove the former K.S.A. 21-3107(2)(d). See L. 1998, ch. 185, § 1. In its place, the legislature inserted a new version, K.S.A. 2000 Supp. 21-3107(2)(b), which provides that an included crime is one where "all of the elements of the lesser crime are identical to some of the elements of the crime charged." This will necessarily change the multiplicity analysis for cases which occur under the new statute and signifies a return to the identity of the elements standard that this court used prior to the enactment of K.S.A. 21-3107. Such a change, while allowing convictions for crimes which would have been multiplicitous under the statute at issue here, does not violate constitutional prohibitions against double jeopardy as it does not subject defendants to punishments greater than those intended by the legislature. [Citation omitted.]' 272 Kan. at 147.

"We do not believe the dicta in *Garcia* signifies a retreat by the Kansas Supreme Court from its holdings in *Warren* and *Vontress*. Both of those cases were analyzed under a single act of violence paradigm unaffected by a lesser included analysis under K.S.A. 21-3107, before or after the 1998 amendment. We conclude the dicta in *Garcia* is not persuasive authority the Supreme Court will retreat from its holdings in *Warren* and *Vontress*. Accordingly, we hold Groves' conviction for aggravated battery must be set aside and the charge dismissed." 31 Kan. App. 2d at 636-38.

This court agreed that "the single act of violence paradigm concerning multiplicity is unaffected by the lesser included analysis under K.S.A. 21-3107 before or after the 1998 amendment." 278 Kan. at 305. To support this conclusion, the court discussed the general principles of multiplicity as set out in *Schuette*, 273 Kan. 593; *Garcia,* 272 Kan. 140; and *Garnes*, 229 Kan. 368, and cited other cases applying a single act of violence paradigm, including *State v. Cathey*, 241 Kan. 715, 741 P.2d 738 (1987); *State v. Bishop*, 240 Kan. 647, 732 P.2d 765 (1987); and *State v. Racey*, 225 Kan. 404, 590 P.2d 1064 (1979).

Application of the single act of violence paradigm resulted in Groves' conviction for aggravated battery being set aside. This same relief would not have resulted from application of the same-

elements test; aggravated robbery and aggravated battery do not share identical elements.

Thus, *Groves* illustrates that the single act/merger test provides broader protection against prosecution and conviction in multiple description cases than does the *Blockburger* analysis applied under a Fifth Amendment analysis. The State suggests that there is no constitutional basis for this broader protection. To resolve this issue, we must examine the development of the multiplicity and double jeopardy issue in Kansas. In doing so, we divide our discussion into (1) early common law; (2) single act of violence cases decided prior to 1969 (when K.S.A. 21-3107 was enacted); (3) cases decided between 1969 (following the enactment of K.S.A. 21-3107) and 1998 (when K.S.A. 21-3107 was amended); (4) cases decided after the 1998 amendment; (5) cases applying the merger doctrine; and (6) felony-murder cases.

### 3. Discussion of Single Act/Merger Doctrine

*Early common law. Garcia* and many of the cases discussed in *Groves* that applied the single act of violence paradigm either cite an 1884 case, *State v. Colgate,* 31 Kan. 511, 3 Pac. 346 (1884), as the original source of the doctrine or cite a line of cases that can be traced back to *Colgate. E.g., Garcia,* 272 Kan. at 143. *Colgate* is a unit of prosecution case arising from successive prosecutions. In the first case, Colgate was acquitted of arson for setting fire to and burning a grist mill. Later, a new prosecution was instituted against him for setting fire to and burning the books of account that were located in the mill and were destroyed in the same fire that destroyed the mill. The court concluded the "principal facts constituting the two alleged offenses are identically the same." 31 Kan. at 514. The court noted that "if the defendant did in fact set fire to the books of account and burn the same, he was guilty of arson, not only with respect to the books of account, but also with respect to the mill, and all the machinery, flour, tables, chairs, desks, safe and all the other innumerable articles contained in the mill and consumed by that burning." 31 Kan. at 518. The court noted that the question was the proper limit for separate prosecutions: was it the number of criminal acts committed or the num-

ber of articles burned? The court found that the prosecution was limited by the number of criminal acts, and did not allow the prosecutor to "multiply prosecutions indefinitely by dividing up the consequences of a single wrongful act and founding a separate prosecution upon each of such consequence." 31 Kan. at 520. In doing so, the court stated the following language which is cited as justification for the single act of violence doctrine: "[U]pon general principles a single offense cannot be split into separate parts, and the supposed offender be prosecuted for each of such separate parts, although each part may of itself constitute a separate offense." 31 Kan. at 515.

What has been lost over time in the reliance on *Colgate,* is the *Colgate* court's discussion and distinction of a previously decided multiple description case, *State v. Horneman,* 16 Kan. 452 (1876). In *Horneman,* the defendant was indicted for the crime of shooting with intent to kill. He had previously been acquitted of a charge of maliciously shooting and wounding a horse. The shooting charged in the two cases was "one and the same." 16 Kan. at 454. The court determined both cases could be prosecuted, stating:

"The two offenses are entirely distinct. One is not included in the other—is not a lesser degree of the other. The character of the testimony must be different in each. One fact, that is, 'shooting,' may be necessary for conviction under either charge. But something more is necessary in each, than the mere fact of shooting. . . . 'The same act may be part of several offenses.' " 16 Kan. at 455.

The *Colgate* court, in order to reconcile its statement that a single offense cannot be split into separate parts with the statement in *Horneman* that the same act may be part of several offenses, noted that *Horneman* involved "two different kinds of offenses, with entirely different natures of intent." 31 Kan. at 520. Thus, the court distinguished between unit of prosecution cases and multiple description cases and rejected the single act of violence paradigm in the context of multiple description cases.

Later, however, this distinction was lost.

*Single Act of Violence Cases Prior to 1969 (When K.S.A. 21-3107 Was Enacted).* Many of the cases decided after *Colgate* in which there was discussion of the splitting a single act into separate parts in multiple description cases were discussed in *State v. Gauger,*

200 Kan. 515, 438 P.2d 455 (1968). *Gauger* appears to be the first case to use the language of a "single act of violence." 200 Kan. at 525. In *Gauger*, the court held that a defendant could not be convicted of robbery and assault with intent to rob arising out of a single act of violence or intimidation. The court cited several cases as precedent for its decision, including *Colgate* and *State v. McLaughlin*, 121 Kan. 693, 249 Pac. 612 (1926), in which the court stated that to carve one single act into two distinct offenses violated § 10 of the Kansas Constitution Bill of Rights. 121 Kan. at 697-98. The *Gauger* court also distinguished several cases and, in doing so, used a "same evidence" test:

"This situation is clearly distinguishable from those cases where a single criminal transaction constitutes two separate offense because evidence required to prove the two offense would not be the same. (See, *e.g., State v. Brown,* 181 Kan. 375, 312 P.2d 832 [first-degree kidnapping and forcible rape]; *Wagner v. Edmondson,* 178 Kan. 554, 290 P.2d 98 [assaulting a jailer and jailbreak]; *Wiebe v. Hudspeth,* 163 Kan. 30, 180 P.2d 315 [statutory rape and incest].)" 200 Kan. at 525.

This analysis is confusing because it appears that the distinguished cases applied an elements-type of examination—the evidence required to prove the two offenses—while *Gauger* examined the evidence actually used to prove the offenses.

It is noteworthy that at this point in time the court was utilizing a test in successive prosecution cases where the commonality of facts did not give rise to a double jeopardy violation:

" 'In criminal cases the ultimate test applied in determining the validity of a plea of former conviction or former acquittal is identity of offenses, and it is not necessarily decisive that the two offenses may have some material fact in common.' *State v. Ragan,* 123 Kan. 399, Syl. ¶ 2, 256 Pac. 169 [1927]." *State v. Edgington,* 223 Kan. 413, 416, 573 P.2d 1059 (1978) (noting that the United States Supreme Court applied the test of whether each provision required proof of a fact the other did not, citing *Brown v. Ohio,* 432 U.S. 161).

In other cases involving successive prosecution, the court has discussed and applied United States Supreme Court cases. However, in multiple description cases it has not done so except in a very few cases. *Blockburger*, although decided in 1932, was not cited by a Kansas court until 1978 and that was in a successive prosecution case. See *State v. Smith,* 224 Kan. 662, 595 P.2d 1006

(1978). Rather, the analysis in the multiple description cases has been stated in terms of multiplicity without reference to the test developed under the Fifth Amendment.

*Cases Decided Between 1969 (Following the Enactment of K.S.A. 21-3107) and 1998 (When K.S.A. 21-3107 Was Amended).* The year following *Gauger*, the Kansas Legislature passed K.S.A. 21-3107, which provided:

"(1) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. . . .

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

(a) A lesser degree of the same crime;

(b) An attempt to commit the crime charged;

(c) An attempt to commit a lesser degree of the crime charged;

(d) A crime necessarily proved if the crime charged were proved." L. 1969, ch. 180, sec. 21-3107.

Initially, the statute was not cited in cases dealing with multiplicity. See, *e.g., Davis v. State,* 210 Kan. 709, 712, 504 P.2d 617 (1972). Even as late as 1981, when the court set out three multiplicity rules, it did so without reference to K.S.A. 21-3107. *State v. Garnes,* 229 Kan. 368. The first of the three rules stated in that opinion was: "A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution." *Garnes,* 229 Kan. at 373. *Garnes* was cited as precedent for the single act of violence/merger rule in several cases holding that a single act could not support convictions on two charges. *E.g., State v. Warren,* 252 Kan. 169, 175-81, 843 P.2d 224 (1992); *State v. Smith,* 245 Kan. 381, 392, 781 P.2d 666 (1989); *State v. Cathey,* 241 Kan. 715, 719-20, 741 P.2d 738 (1987).

In time, K.S.A. 21-3107 began to play a role in the multiplicity analysis and the analysis shifted. In *State v. Freeman,* 236 Kan. 274, 281, 689 P.2d 885 (1984), the court explained the statute's role in a multiplicity analysis, noting that the provision was enacted "to implement and define the constitutional guarantees of the double jeopardy clause." Addressing those constitutional guarantees,

the court observed that § 10 of the Kansas Constitution Bill of Rights "is very similar to the language contained in the Fifth Amendment" and concluded that "[t]he language of the Fifth Amendment guarantees no greater protection to an accused than does section 10 of the Bill of Rights of the Constitution of Kansas." 236 Kan. at 281.

The *Freeman* court stated the test for multiplicity, citing as authority for the test *State v. Chears*, 231 Kan. 161, 643 P.2d 154 (1982) (postdating enactment of K.S.A. 21-3107), which cited to *Wagner v. Edmondson*, 178 Kan. 554, 290 P.2d 98 (1955) (predating enactment of K.S.A. 21-3107):

"K.S.A. 1983 Supp. 21-3107 provides statutory authority where criminal conduct of a defendant, although consisting of a single transaction, may result in a multiple violation of the criminal code, for which the defendant may be severally prosecuted. [Citation omitted]. The prosecution may not split a single offense into separate parts where there is a single wrongful act which does not furnish the basis for more than one criminal prosecution. The test concerning whether a single transaction may constitute two separate and distinct offenses is whether the *same evidence* is required to sustain each charge. If not, the fact that both charges relate to and grow out of the same transaction does not create a single offense where two distinct offense are defined by statute." (Emphasis added.) 236 Kan. at 281.

This "same evidence" test proved to be sufficiently ambiguous such that inconsistent and irreconcilable outcomes resulted. Frequent applications of this test as an elements standard can be found. For example, in *State v. Mincey*, 265 Kan. 257, 263, 963 P.2d 403 (1997), the court stated: "[M]ultiplicity does not depend upon whether the facts proved at trial are actually used to support conviction of both offenses charged; rather, it turns upon whether the necessary elements of proof of the one crime are included in the other."

*Mincey* and other cases took the position that K.S.A. 21-3107(2)(d), which stated a crime is a lesser crime if it is "necessarily proved if the crime charged were proved," and the two-prong test as described in *State v. Fike*, 243 Kan. 365, 368, 757 P.2d 724 (1988), which was developed to apply K.S.A. 21-3107(2)(d), did not change the analysis. 265 Kan. at 264 (defendant "mistakenly assumed that *Fike* had expanded the traditional element test to

determine if convictions are multiple punishments for the offenses"). However, with time, the court began to apply the *Fike* test. In one of the last cases to apply the "necessarily proved" test of K.S.A. 21-3107 before it was removed from the statute by a 1998 amendment, the court observed that "[t]he *Fike* test has been frequently applied in performing multiplicity analyses." *State v. Robbins*, 272 Kan. 158, 172-73, 32 P.3d 171 (2001) (crimes occurring before amendment). The court explained how the *Fike* test functioned within a multiplicity analysis:

"Subsection (2)(d) is relevant to some of Robbins' multiplicity arguments. In determining whether a crime is an 'included crime' under K.S.A. 21-3107(2)(d), a two-prong test as described in *State v. Fike*, 243 Kan. 365, 368, 757 P.2d 724 (1988) applies. The first step is to determine whether all of the statutory elements of the lesser crime are among the statutory elements required to prove the greater crime. If so, then the lesser crime is a lesser included offense of the greater crime. Even if the elements differ, the inquiry is not over. Under the second prong, the court determines whether the factual allegations of the charging document and the evidence required to be adduced at trial to prove those allegations would also necessarily prove the lesser crime. If so, then there is multiplicity. *State v. Warren*, 252 Kan. 169, 175-81, 843 P.2d 224 (1992)." 272 Kan. at 172.

The citation to *Warren* is significant because it is one of the two principal cases relied upon in *Groves*, the other one being *Vontress*. Both applied the *Fike* test, although the *Vontress* court did not acknowledge that it was doing so. In *Vontress*, the court cited the language from *Mincey* that multiplicity depends on the elements not the facts used at trial. However, when the court conducted its analysis, it did not follow the *Mincey* rule; rather it looked at the facts proven. The court noted that a single act of violence—firing a shot—was used to establish the bodily harm element of aggravated robbery and was "the same fact necessary for proof of the great bodily harm element of aggravated battery." 266 Kan. at 257. This is the language of K.S.A. 21-3107(2)(d) as applied in *Fike*; thus, the court looked beyond the elements of the crimes to see how the elements were charged and proven.

In *Warren*, the defendant argued his convictions were multiplicitous because the same act—knocking the purse snatching victim to the ground—was the fact which proved the great bodily harm element of both the aggravated robbery and aggravated battery

convictions. The court discussed the *Fike* test and then stated: "Warren's multiplicity argument first will be analyzed under the second prong of the *Fike* test." 252 Kan. at 180. "After examining the allegations contained in the complaint and the evidence adduced at trial," the court concluded that it was "clear that the necessary elements of proof for aggravated robbery also established the necessary elements of proof for aggravated battery." 252 Kan. at 180.

Then, without explanation as to why it was doing so, the court conducted an analysis of the "traditional multiplicity test, as set forth in *State v. Garnes*, 229 Kan. 368, 624 P.2d 448 (1981)." *Warren*, 252 Kan. at 181. In doing so, the court rejected the elements test as a sole test and stated:

"If the charges in this case are not multiplicitous because one charge involves proof of fact not required in proving the other, then it leads to the conclusion that only crimes involving identical elements can be multiplicitous. This cannot be the case because this court has found crimes involving different elements multiplicitous. See, e.g., *State v. Smith*, 245 Kan. 381, 392, 781 P.2d 666 (1989) (aggravated battery and attempted first-degree murder multiplicitous); *State v. Cathey*, 241 Kan. 715, 719-20, 741 P.2d 738 (1987) (same); *Garnes*, 229 Kan. 373-74 (same). Why were these convictions not multiplicitous? Crimes involving different elements, if taken literally, necessarily will require proof of a fact not required in proving the other." *Warren*, 252 Kan. at 182.

Subsequently, the court discussed *Warren's* application of the *Fike* test to multiplicity. The defendant in *State v. Rinck*, 256 Kan. 848, 888 P.2d 845 (1995), relied upon *Warren* to argue that his convictions and sentences for aggravated robbery and aggravated battery were multiplicitous because they arose from the same act of violence. The State acknowledged the *Warren* decision, but asked the court to follow *State v. Higgins*, 243 Kan. 48, 55-56, 755 P.2d 12 (1988), in which the court had applied an elements test and found that aggravated robbery and aggravated battery were not multiplicitous. Determining that *Warren* controlled the decision, the court stated:

"We also note that *Higgins* predates this court's decision in *State v. Fike*, 243 Kan. 365, 757 P.2d 724 (1988). *Fike* established a two-prong analysis to determine lesser included offenses. Under the second prong of *Fike*, not considered by *Higgins*, the court must examine the allegations of the indictment, complaint, or

information, as well as the evidence which must be adduced at trial, and if the allegations allege a lesser crime and the evidence which must be adduced at trial would also prove the lesser crime, the lesser crime is an included crime. 243 Kan. at 368, 757 P.2d 724. This court in *Warren* used the second prong of *Fike* to conclude that the defendant's convictions for aggravated robbery and aggravated battery were multiplicitous. 252 Kan. at 181." 256 Kan. at 850.

This conclusion is the opposite of that reached by the Court of Appeals panel in *Groves* when it stated that *Warren* was "analyzed under a single act of violence paradigm unaffected by a lesser included analysis under K.S.A. 21-3107, before or after the 1998 amendment." 31 Kan. App. 2d at 638. It also weakens this court's broader statement in *Groves* that "the single act of violence paradigm concerning multiplicity is unaffected by the lesser included analysis under K.S.A. 21-3107 before or after the 1998 amendment." 278 Kan. at 305 (citing other authority which did not use test under K.S.A. 21-3107). The *Groves* court also cited *State v. Racey*, 225 Kan. 404, 408, 590 P.2d 1064 (1979), and *State v. Bishop*, 240 Kan. 647, 732 P.2d 765 (1987), as authority for the single act of violence paradigm. They are examples which support the court's holding in *Groves*. However, they derive from the line of cases misreading *Colgate*. *Racey* cites *State v. Lassley*, 218 Kan. 758, 761-62, 545 P.2d 383 (1976), which in turn cites the *Gauger* decision previously discussed and two other cases. One, *State v. Lora*, 213 Kan. 184, 190, 515 P.2d 1086 (1973), cited *Gauger* as the precedent for the rule. The other, *State v. James*, 216 Kan. 235, 237, 531 P.2d 70 (1975), cited *Jarrell v. State*, 212 Kan. 171, 510 P.2d 127 (1973), which in turn cited *Gauger* and *Colgate* as precedent. *Bishop*, the other case cited in *Groves*, cites *Garnes, Lassley, and Racey*.

Despite the disagreement over how to read *Warren*, the court continued to recognize a common-law source for multiplicity. As the court stated in 1999, in *Garcia*:

"The concept of multiplicity in Kansas comes from two sources. The first is the traditional 'common-law' multiplicity concept. This exists where the State attempts to use a single wrongful act as the basis for multiple charges and is based on the merger of the charges. *State v. Garnes*, 229 Kan. 368, 372, 624 P.2d 448 (1981). This concept has been a part of Kansas law since at least our decision in *State v. Colgate*, 31 Kan. 511, 515, 3 Pac. 346 (1884), wherein we stated: '[U]pon general

principles a single offense cannot be split into separate parts, and the supposed offender be prosecuted for each of such separate parts, although each part may of itself constitute a separate offense.' The test for whether the offenses merge and are, therefore, multiplicitous is whether each offense charged requires proof of a fact not required in proving the other; if so, then the offenses do not merge and are not multiplicitous. *Garnes,* 229 Kan. at 373, 624 P.2d 448. Offenses also do not merge if they are committed separately and severally at different times and at different places. 229 Kan. at 373.

. . . .

"However, the legislature added another layer to the multiplicity analysis with the passage of K.S.A. 21-3107. See *State v. Freeman,* 236 Kan. 274, 281, 689 P.2d 885 (1984) (noting that 21-3107 'formulates the limitations upon unfair multiplicity of convictions or prosecutions')." 272 Kan. at 143-44.

This passage brings into focus a question never answered in the cases: If K.S.A. 21-3107 was a formulation of the limitations upon multiplicity, how does the common law survive enactment of the provision? Arguably, this question need not be resolved if the common law and the statute are coextensive. Several cases indicate that after the 1998 amendments to K.S.A. 21-3107, the statutory and common-law tests were the same.

*Cases Decided After the 1998 Amendment.* In 1998, K.S.A. 21-3107 was amended and subsection (2)(d) was eliminated. L. 1998, ch. 185, sec. 1. It was replaced with language defining an included crime as "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." See K.S.A. 2005 Supp. 21-3107(2)(b). (The remaining provisions were reordered.)

On several occasions shortly after the passage of the amendment, the court stated that the amendment meant a return to the common-law elements test. In *Garcia,* the court stated that the amendment

"will necessarily change the multiplicity analysis for cases which occur under the new statute and signifies a return to the identity of the elements standard that this court used prior to the enactment of K.S.A. 21-3107. Such a change, while allowing convictions for crimes which would have been multiplicitous under the statute at issue here, does not violate constitutional prohibitions against double jeopardy as it does not subject defendants to punishments greater than those intended by the legislature. See *Missouri v. Hunter,* 459 U.S. at 366-69." 272 Kan. at 147.

· Similarly, in *State v. Schuette*, 273 Kan. 593, 601-02, 44 P.3d 459 (2002), the court noted: "The present statutory language in essence mirrors the common-law elements test, thereby leaving it as the only remaining test for multiplicity." See also *Robbins*, 272 Kan. at 173 (noting that *Fike* appears irrelevant under the amended statute).

However, as discussed, the *Groves* decision reflects that single act/merger analysis still may be applied. 278 Kan. at 305.

*Cases Applying Merger Doctrine.* As this historical analysis indicates, a concept of whether "the offenses merge and are, therefore, multiplicitous" (272 Kan. at 143), had emerged. *State v. Thornton*, 224 Kan. 127, 577 P.2d 1190 (1978), appears to be the first case discussing merger in the context of multiplicity (other than in a felony-murder case, *e.g.*, *State v. Rueckert*, 221 Kan. 727, 734-35, 561 P.2d 850 [1977]). In *Thornton*, the court stated:

> "Although the elements of the two offenses are different, and although we have held that possession of marijuana is not a lesser included offense in a prosecution for sale of marijuana [citation omitted], we are convinced that the offense of possession of marijuana with *intent to sell* is merged with the crime of sale of marijuana where, as here, the sale was consummated. In *Prince v. United States*, 352 U.S. 322, 1 L. Ed. 2d 370, 77 S. Ct. 403 (1957), the United States Supreme Court held that the offense of entering a bank with the intent to commit a felony or larceny therein was merged with the crime of bank robbery when the latter crime was consummated. The court said:
>
> '. . . [T]he heart of the crime is the intent to steal. This mental element merges into the completed crime if the robbery is consummated. . . .' (p. 328).
>
> "Here, the state charged that Thornton possessed marijuana with the intent to sell it. He sold it to Officer Grow. The intent to sell merged into the crime of sale when the sale was consummated." 224 Kan. at 131.

The reliance on *Prince* was misplaced. In *Prince v. United States*, 352 U.S. 322, 1 L. Ed. 2d 370, 77 S. Ct. 403 (1957), the defendant was charged with violations of the Federal Bank Robbery Act. The Court looked to the legislative history of the act and concluded that the "manifest purpose" was to establish lesser offenses, not to "pyramid penalties." 352 U.S. at 327. With respect to the unlawful entry, the Court noted that the "gravamen of the offense is not in the act of entering. . . . Rather the heart of the crime is the intent to steal." 352 U.S. at 328. It is in this context that the Court con-

cluded: "This mental element merges into the completed crime if the robbery is consummated." 352 U.S. at 328.

The United States Supreme Court has not applied the doctrine in a similar context since. One commentator explains that in *Prince*

"[t]he Court did not explain the meaning of this 'merger' language. It was not being used in the common-law sense, and the likelihood is that it was the Court's shorthand expression for the determination that Congress intended a single offense to result when both provisions were violated in the same criminal transaction." Thomas, 47 U. Pitt. L. Rev. at 40-41.

The common-law doctrine of merger was explained by the Court in *Callanan v. United States*, 364 U.S. 587, 5 L. Ed. 2d 312, 81 S. Ct. 321 (1961):

"Under the early common law, a conspiracy—which constituted a misdemeanor—was said to merge with the completed felony which was its object. [Citation omitted.] This rule, however, was based upon significant procedural distinctions between misdemeanors and felonies. The defendant in a misdemeanor trial was entitled to counsel and a copy of the indictment; these advantages were unavailable on trial for a felony. [Citation omitted.] Therefore no conviction was permitted of a constituent misdemeanor upon an indictment for the felony. When the substantive crime was also a misdemeanor [citation omitted] or when the conspiracy was defined by statute as a felony, [citation omitted] merger did not obtain. As these common-law procedural niceties disappeared, the merger concept lost significance, and today it has been abandoned. [Citations omitted.]" 364 U.S. at 589-90.

There is no indication that the Court revived the doctrine by its use of the term "merged" in *Prince*. Subsequent to *Prince*, the Court has referred to "merger" only in limited contexts. Often, the Court has reiterated that the doctrine does not apply when conspiracy is charged. *E.g., Iannelli v. United States*, 420 U.S. 770, 777-82, 43 L. Ed. 2d 616, 95 S. Ct. 1284 (1975) (conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act). Additionally, the Court has discussed whether the underlying felony merges with the murder in a felony-murder case. *E.g., Williams v. Oklahoma*, 358 U.S. 576, 587, 3 L. Ed. 2d 516, 79 S. Ct. 421 (1959) ("Nor, in view of the fact that kidnaping and murder are separate and independent offenses in Oklahoma, is there any merit in petitioner's collateral claim that what he calls 'the lesser crime' of kidnapping

'merged' in what he calls the 'greater crime' of murder and that the sentence to life imprisonment for the murder was a bar to the imposition of any sentence for the kidnaping.").

While Kansas has also used the term in the context of the underlying felony merging with the murder in felony murder cases, the term has also been used in the broader sense to describe what happens when convictions are multiplicitous. *E.g., State v. Edwards,* 250 Kan. 320, 331, 826 P.2d 1355 (1992) (aiding and abetting the making of a false writing and soliciting an individual to make a false writing are not multiplicitous and do not merge because each crime involves different elements).

*Felony-Murder Cases.* In 1981, when the *Garnes* court stated the first of the three multiplicity rules—"a single wrongful act may not furnish the basis for more than one criminal prosecution"— the court then gave an example: "Where an aggravated assault or aggravated battery directly results in a homicide, the offenses become merged. See *State v. Clark,* 204 Kan. 38, 44, 460 P.2d 586 (1969)." *Garnes,* 229 Kan. at 373.

The reliance upon *Clark* illustrates the confusion in the case law and the inconsistent ways the court analyzed the single act of violence issue in the context of felony-murder cases as opposed to the manner it considered the issue in other contexts. *Clark* is a felony-murder case which, despite being cited to in *Garnes,* did not discuss a multiplicity or double jeopardy issue. Clark had been convicted of only one count, felony murder. The issues related to instructions regarding felony murder; specifically, the portion of the decision relied upon by the *Garnes* court related to a question of whether aggravated assault could serve as the underlying felony. The court noted that the purpose of felony murder was to "relieve the state of the burden of proving premeditation and malice when the victim's death is caused by the killer while he is committing another felony." 204 Kan. at 43. This could be allowed, the court concluded, if the underlying felony was a " 'distinct offense, such as robbery, arson, or the like.' " 204 Kan. at 43-44 (quoting *State v. Fisher,* 120 Kan. 226, 231, 243 Pac. 291 [1926]). "But where the other felony, such as an assault, directly results in or is an integral element of the homicide, the assault becomes merged with the

killing and cannot be relied upon as an ingredient of felony murder." 204 Kan. at 44.

However, other cases, including *Fisher*, did use a similar merger/distinct crime analysis within a double jeopardy context. Several of these cases used a single act of violence analysis. See *State v. Smallwood*, 264 Kan. 69, 94, 955 P.2d 1209 (1998); *State v. Leonard*, 248 Kan. 427, 807 P.2d 81 (1991); *Fisher*, 120 Kan. 226.

In contrast to these cases, in most instances, the felony-murder cases represent a departure from all other multiple description cases in that the analysis has more often and more closely paralleled that of the United States Supreme Court in its double jeopardy cases. In analyzing double jeopardy issues regarding felony murder and its merger with the underlying felony, the court has examined elements, not facts, to determine if the offense was distinct. *E.g., State v. Dunn*, 243 Kan. 414, 433, 758 P.2d 718 (1988) ("If there is evidence to support the elements of kidnapping and evidence to support that homicide was committed during the perpetration of the kidnapping, then the offense would not merge."); see also *State v. Gonzales*, 245 Kan. 691, 706, 783 P.2d 1239 (1989) (applying *Dunn* and noting defendant had failed to distinguish between the lesser included offense doctrine and the felony-murder merger doctrine each of which is "a separate legal theory" existing in a "distinct legal pigeonhole"). Additionally, in *State v. Holt*, 260 Kan. 33, 917 P.2d 1332 (1996), the court noted that the resolution of the double jeopardy issue depends on whether the Kansas Legislature intended to allow conviction and punishment for both felony murder and the underlying felony. 260 Kan. at 45 (citing *Gonzales*, 245 Kan. at 704). This reasoning paralleled that of the United States Supreme Court in *Missouri v. Hunter*, 459 U.S. 359, 368-69, 74 L. Ed. 2d 535, 103 S. Ct. 673 (1983), when it recognized that a legislature could authorize cumulative punishment under felony murder and underlying felony statutes.

The Kansas Legislature authorized multiple punishments by enacting K.S.A. 21-3436. K.S.A. 2005 Supp. 21-3436 lists those felonies which shall "be deemed an inherently dangerous felony whether or not such felony is so distinct from the homicide alleged to be a violation of" the felony-murder provision and those which

"shall be deemed an inherently dangerous felony only when such felony is so distinct from the homicide alleged to be a violation of" the felony-murder provision. Through these provisions, the legislature stated its intent as to when cumulative punishments can be imposed.

*State v. Mims*, 264 Kan. 506, 956 P.2d 1337 (1998), is representative of the case law decided after enactment of the felony-murder statute. In *Mims*, the court separated the double jeopardy and multiplicity analysis which parallel the federal case law in recognizing that such an enactment was a clear indication of legislative intent to allow multiple punishments. First, addressing the defendant's argument that his conviction and consecutive sentences for both felony murder and the underlying felony of aggravated robbery "violate[d] the Double Jeopardy Clause of the United States and Kansas Constitutions, as well as K.S.A. 21-3107(2)(d), precluding punishment for a crime necessarily proved if the crime charged were proved," the *Mims* court stated:

"We have recently considered this same objection in *State v. Sims*, 262 Kan. 165, Syl. ¶ 5, 936 P.2d 779 (1997), where we held: 'When the underlying felony supports a felony-murder charge, it is well-established law in Kansas that multiple convictions and punishments for both felony murder and the underlying felony do not violate double jeopardy.'

"When the same act or transaction violates two distinctly different statutory provisions, we must consider when deciding if two crimes have been committed whether each statute requires proof of an element which the other crime does not. 'Where one statute requires proof of an additional or different element, the crimes are not the same, even though the proof of the crimes may substantially overlap.' *Sims*, 262 Kan. at 173. See *State v. Dunn*, 243 Kan. 414, 432-33, 758 P.2d 718 (1988).

"Mims' convictions and consecutive sentences for both felony murder and aggravated robbery involved different elements and, therefore, do not violate principles of double jeopardy or Kansas law." 264 Kan. at 516-17.

The court then discussed the claim of multiplicity, stating:

"[Mims] cites K.S.A. 21-3107(2)(d) as interpreted by *State v. Fike*, 243 Kan. 365, 757 P.2d 724 (1988), to support his argument that only the conspiracy count should remain.

"This argument has no merit under Kansas law. The Kansas Legislature clearly provided in K.S.A. 21-3436 that the crimes of felony murder and aggravated robbery shall not merge. Further, we have held: 'The commission of the substantive

offense and a conspiracy to commit it are separate and distinct offenses. The legislature is empowered to separate the two and to affix to each a different penalty.' *State v. Tyler,* 251 Kan. 616, Syl. ¶ 12, 840 P.2d 413 (1992). This issue also fails." 264 Kan. at 517.

Thus, by this point in time, the felony-murder cases were, in most instances, being analyzed under the elements test. Legislative intent was recognized as the key to determining whether cumulative punishment could be allowed. The analysis in *Mims* and similar cases was consistent with that of the United States Supreme Court. See, *e.g., State v. Ramos,* 271 Kan. 520, 24 P.3d 95 (2001); *State v. Rayton,* 268 Kan. 711, 725, 1 P.3d 854 (2000); *State v. Sims,* 262 Kan. 165, Syl. ¶ 5, 936 P.2d 779 (1997); *Holt,* 260 Kan. at 45-46; *cf. State v. Jones,* 257 Kan. 856, 896 P.2d 1077 (1995) (discussing merger and single act of violence but not in double jeopardy context).

Other cases, however, did not follow this analysis, usually without an attempt at reconciliation of the case law. See, *e.g., Smallwood,* 264 Kan. at 94; *Leonard,* 248 Kan. 427.

### 4. Impact of Patten

This historical review reveals the doctrinal inconsistency and confusion that abounds in multiplicity cases. The result was two divergent lines of cases. One line of cases culminated with the decision in *Groves,* 278 Kan. 302, which appropriately applied the precedent cited in that case. The other line culminated in *Patten,* 280 Kan. 385, which followed a long line of cases in which "[i]t has been repeatedly held by this and other courts that the same acts may constitute a violation of two separate statutes and such fact does not amount to placing the defendant in jeopardy twice." *Dionne v. Hudspeth,* 166 Kan. 72, 73, 199 P.2d 176 (1948). The confusion resulting from having these two divergent and unreconciled lines of cases is illustrated by the presence of another case argued before this court on the same docket as this case in which virtually identical multiplicity arguments were made. In that case, *State v. Unruh,* (No. 90,498, this day decided), a Court of Appeals panel analyzed the arguments using the elements test only and did not discuss the single act/merger analysis which was applied by the

Court of Appeals panel in this case. This dichotomy is understandable. It is difficult to discern a coherent pattern for when the single act of violence/merger paradigm applies and when it does not. As concluded in *Patten*, it seems that the test which is applied depends upon how the parties have argued the case, not upon doctrinal consistency. 280 Kan. at 393.

This brings us back to the issue raised in this case. Will the divergent theories continue, especially in light of the recent holding in *Patten* clarifying that a strict elements test applies rather than an evidence test? The answer is "no." We conclude that the single act of violence/merger analysis should no longer be applied when analyzing double jeopardy or multiplicity issues in the context of multiple description cases where a defendant has been convicted of violations of multiple statutes arising from the same course of conduct. We reach this conclusion for several reasons.

First, use of the single act/merger test broadens the scope of protection beyond that provided under the Fifth Amendment. While we can recognize a broader right under the Kansas Constitution, we have not explicitly done so in our multiplicity cases. Generally, provisions of the Kansas Constitution which are similar to the Constitution of the United States have been applied in a similar manner. See, *e.g.*, *State v. Morris*, 255 Kan. 964, 979-81, 880 P.2d 1244 (1994) (right to counsel under § 10 of the Kansas Constitution Bill of Rights provides same protection as accorded by Fifth and Sixth Amendments to the United States Constitution); *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993) (§ 15 of the Kansas Constitution Bill of Rights identical in scope to Fourth Amendment); *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981) (§ 1 of the Kansas Constitution Bill of Rights given same effect as Equal Protection Clause of Fourteenth Amendment). No reason has been suggested why we should do otherwise in the area of double jeopardy.

Second, as discussed, we have previously stated that the Fifth Amendment provides the same protection as does the Kansas Constitution. *E.g., State v. Cady*, 254 Kan. 393, 396-97, 867 P.2d 270 (1994).

Third, rejecting the single act of violence/merger doctrine in the context of multiple description cases reconciles the difference in the treatment of single act of violence cases dealing with felony murder and the treatment of all other cases dealing with a single act of violence paradigm.

Fourth, rejecting the single act of violence/merger doctrine in the context of multiple description cases reconciles the difference in the treatment of successive prosecution cases, which have been analyzed in a manner consistent with the United States Supreme Court's interpretation of the Fifth Amendment, with the treatment of multiple description cases, which have not been analyzed in a manner consistent with the United States Supreme Court's interpretation of the Fifth Amendment. See, *e.g.*, *State v. Edgington*, 223 Kan. 413, 416, 573 P.2d 1059 (1978).

Fifth, there is no justification for continuing to apply common-law multiplicity doctrines, at least in the context of multiple description cases, in light of the passage of K.S.A. 21-3107, which has been recognized as setting limitations on the parameters of multiplicity. K.S.A. 2005 Supp. 21-3107 provides:

"(1) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be *prosecuted* for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment.

"(2) Upon prosecution for a crime, the defendant may be *convicted* of either the *crime charged or a lesser included crime*, but not both." (Emphasis added.)

The statute is a clear statement of legislative intent to have multiple convictions when separate statutes describe the criminal conduct except when one of the statutes proscribes a lesser included crime of another. In light of those provisions, there is no basis for application of the common law in multiple description cases. See *State v. Berberich*, 248 Kan. 854, 858, 811 P.2d 1192 (1991) (finding that prior to the 1969 adoption of the Kansas Criminal Code, Kansas followed the traditional common-law rule on instructing the jury on lesser included offenses, *i.e.*, the elements test, and that statute had replaced common law); see *Missouri v. Hunter*, 459 U.S. at 368-69 (cumulative punishment constitutional when "a legislature specifically authorizes cumulative punishment under two

statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*").

Sixth, if we were to continue applying the single act/merger doctrine we would be doing so based upon case law which is impossible to reconcile and holdings that have not been consistently applied.

Finally, we recently adopted the same-elements test in *Patten*. In doing so, we stated: "What most recommends the strict elements analysis is its logical, mechanical ease of application and, hence, certainty. Consideration of the facts proved, in contrast, puts multiplicity on a case-by-case basis." *Patten*, 280 Kan. at 393. To continue application of the single act/merger doctrine would immediately undermine this rationale.

For these reasons we hold that the test to determine whether charges in a complaint or information under different statutes are multiplicitous is whether each offense requires proof of an element not necessary to prove the other offense; if so, the charges stemming from a single act are not multiplicitous. We further hold that this same-elements test will determine whether there is a violation of § 10 of the Kansas Constitution Bill of Rights when a defendant is charged with violations of multiple statutes arising from the same course of conduct.

Because the single act of violence/merger analysis has resulted in outcomes which cannot be reconciled with cases applying the same-elements test, lack of predictability as to outcome, disparate analysis, broader protection than required by the Fifth Amendment of the United States Constitution and § 10 of the Kansas Constitution Bill of Rights and contravention of K.S.A. 2005 Supp. 21-3107, the single act of violence/merger analysis will no longer be applied to analyze double jeopardy or multiplicity issues.

We disapprove any language in previous cases which utilized a single act of violence/merger rationale as the basis for holding that two convictions which were based upon different statutes were multiplicitous or resulted in a violation of the Double Jeopardy Clause of the Fifth Amendment or § 10 of the Kansas Constitution Bill of Rights.

### 5. Unit of Prosecution Cases

As recognized in *Colgate,* there is a distinction between multiple

description cases and cases arising when a defendant is charged with multiple violations of a single statute. In a case where a defendant is convicted of multiple violations of a single statute, the test to determine whether the convictions violate § 10 of the Kansas Constitution Bill of Rights is the same test as used to determine if there is a violation of the Due Process Clause of the Fifth Amendment: whether there is more than one conviction for the allowable unit of prosecution.

### D. Summary/Analytical Framework

In order to analyze Schoonover's arguments, it is helpful to state an analytical framework which applies when, as here, the issues arise from cumulative punishments imposed in one case. In considering a double jeopardy issue, the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one? See *Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932) ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is . . . ."); K.S.A. 2005 Supp. 21-3107(1) ("When the *same conduct* of the defendant may establish the commission of more than one crime . . . . [emphasis added]); K.S.A. 2005 Supp. 21-3107(2) ("the defendant may be convicted of either the crime charged or a lesser included crime, but not both").

1. *Do the charges arise from the same conduct?* If the conduct is discrete, *i.e.*, committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation. If the charges arise from the same act or transaction, the conduct is unitary and the second component must be analyzed to see if the convictions arise from the same offense.

To determine if the charges arise from the "same conduct," there are several factors which can be applied. *State v. Garnes*, 229 Kan. 368, 373, 624 P.2d 448 (1981), stated that if the offenses were "committed separately and severally, at different times and differ-

ent places, they cannot be said to arise out of a single wrongful act." In *State v. Smallwood,* 264 Kan. at 92, time, distance, and causal relationship were identified as factors for determining if the acts were committed separately and severally. The *Smallwood* court did not explain the "causal relationship" factor, but other courts have explained that the presence of an intervening event could be a factor. See *Herron v. State,* 111 N.M. 357, 361, 805 P.2d 624 (1991). Additionally, we note the similarity between the same conduct inquiry and the test to determine if there are multiple acts requiring a jury unanimity instruction. In those cases we have stated: " 'Incidents are factually separate when independent criminal acts have occurred at different times or when a late[r] criminal act is motivated by a "fresh impulse." ' [Citations omitted.]" *State v. Kesselring,* 279 Kan. 671, 683, 112 P.3d 175 (2005). Thus, some factors to be considered in determining if conduct is unitary, in other words if it is the "same conduct," include: (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.

2. *By statutory definition are there two offenses or only one?* The test to be applied to answer this question depends on whether the convictions arise from a single statute or from multiple statutes. If the double jeopardy issue arises from convictions for multiple violations of a single statute the unit of prosecution test is applied. If the double jeopardy issue arises from multiple convictions of different statutes, in other words it is a multiple description issue, the same-elements test is applied.

(i) *Unit of prosecution test applied to multiple convictions of a single statute.* If the double jeopardy issue arises because of convictions on multiple counts for violations of a single statute, the test is: How has the legislature defined the scope of conduct which will comprise one violation of the statute? Under this test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each allow-

able unit of prosecution. The unit of prosecution test applies under either the Double Jeopardy Clause of the Fifth Amendment or § 10 of the Kansas Constitution Bill of Rights.

(ii) *Same-elements test applied to multiple convictions of different statutes (multiple descriptions).* If the double jeopardy issue arises because there are multiple convictions for violations of different statutes, in other words a multiple descriptions issue is stated, the test is: Does one statute require proof of an element not necessary to prove the other offense? If so, the statutes do not define the same conduct and there is not a double jeopardy violation. Under this test, when analyzing the claim under the Double Jeopardy Clause of the Fifth Amendment, the same-elements test serves as a rule of statutory construction to discern whether Congress intended multiple offenses and multiple punishments. When the claim is analyzed under § 10 of the Kansas Constitution Bill of Rights, the same-elements test is applied to implement the legislative declaration in K.S.A. 2005 Supp. 21-3107 that a defendant may be convicted of two crimes arising from the same conduct unless one is a lesser included offense of the other.

### E. Analysis of Schoonover's Convictions

Under the first step of the double jeopardy analysis, we must determine whether Schoonover's convictions arise from the same conduct. In this case, there was testimony that a "cook" was in progress at the time of the arrest. The vehicle in which Schoonover was sitting when arrested was described as a "rolling meth lab." In some cases where there is a rolling methamphetamine lab, there may be evidence of separate, discrete acts. In this case, however, the record does not support that conclusion. See *Kesselring,* 279 at 682 (whether conduct constitutes multiple acts is a question of law).

First, while presumably the ingredients and drug manufacturing paraphernalia had been gathered from various locations and some of the process had likely occurred in a location other than the vehicle in which Schoonover was sitting when arrested, these ac-

tions are part of one transaction of manufacturing methamphetamine and do not lead to a conclusion there were separate events. Second, the only evidence regarding time was an opinion that the anhydrous ammonia was probably not in the insulated cooler for more than 6 hours. Third, although there was some methamphetamine, it was not in usable form and laboratory testing of the seized items revealed chemicals representing various stages of the process of manufacturing methamphetamine. There is no evidence that there was an intervening event in the production cycle. Finally, there is no evidence of a fresh criminal impulse of starting a new manufacturing process. Thus, we conclude that the convictions in this case arose from unitary conduct.

Consequently, we proceed to the second step of the analysis, considering whether the various crimes of which Schoonover was convicted are the same offense by statutory definition. Because Schoonover was convicted under multiple statutes, the same-elements test is the applicable test for determining whether there was a double jeopardy violation.

*Manufacture of Methamphetamine and Possession of Methamphetamine.* Schoonover's first argument is that his convictions of manufacture of methamphetamine, in violation of K.S.A 65-4159, and possession of methamphetamine, in violation of K.S.A. 65-4160, are multiplicitous because "[w]hen one successfully completes the process of manufacture, one necessarily possesses meth." See *United States v. Patterson*, 2003 WL 1792292 (A.F. Ct. Crim. App. 2005) (" 'common sense tells you that when you manufacture something, a product of that is going to result in possession' "; charges multiplicitous).

This argument applies to the first step of the analysis, addressing whether the same conduct was involved. It does not satisfy the second step; under the same-elements test, the factual commonality is not dispositive. Rather we must examine the elements of the statutes. Manufacturing methamphetamine requires proof of manufacturing or the ability to manufacture (*State v. Martens*, 274 Kan. 459, 466, 54 P.3d 960 [2002]), while possession of methamphetamine does not. Possession of methamphetamine requires proof of possession, while manufacturing does not. Compare

K.S.A. 65-4159 with K.S.A. 65-4160. There is not an identity of elements between the two statutes; therefore, there is no double jeopardy violation.

*Manufacture of Methamphetamine and Possession of Anhydrous Ammonia in an Unapproved Container.* Next, the defendant contends his convictions of manufacture of methamphetamine, in violation of K.S.A. 65-4159, and possession of anhydrous ammonia in an unapproved container, in violation of K.S.A. 65-4152(a)(4), are multiplicitous because it is not possible to manufacture methamphetamine without having first possessed anhydrous ammonia in an unapproved container. Once again, Schoonover's argument addresses the first step of the analysis, whether the same act is involved.

Under the second step of analysis, applying the same-elements test, we conclude these statutes contain different elements. Manufacturing methamphetamine requires proof of manufacturing or the ability to manufacture, while possession of anhydrous ammonia does not. Possession of anhydrous ammonia requires proof of possession of that chemical in an unapproved container, while manufacturing contains no such element. Compare K.S.A. 65-4159 with K.S.A. 65-4152(a)(4). The elements differ; therefore, there is no double jeopardy violation.

*Manufacture of Methamphetamine and Possession of Ephedrine or Pseudoephedrine as a Precursor.* Next, the defendant contends that his convictions of manufacture of methamphetamine, in violation of K.S.A. 65-4159, and possession of ephedrine or pseudoephedrine as a precursor to an illegal substance, in violation of K.S.A. 65-7006(a), are multiplicitous because it is not possible to manufacture methamphetamine without possessing the precursor ingredients and because the State relied, in part, on the evidence of the presence of ephedrine to prove the manufacture of methamphetamine. Again, under the same-elements test, the factual commonality is not dispositive.

Manufacturing methamphetamine requires proof of manufacturing or the ability to manufacture, while possession of ephedrine or pseudoephedrine does not. Possession of ephedrine or pseudoephedrine requires proof of possession of that substance while

manufacturing does not. Compare K.S.A. 65-4159 with K.S.A. 65-7006(a). The elements differ; therefore, there is no double jeopardy violation.

*Manufacture of Methamphetamine and Possession of Drug Paraphernalia With Intent to Manufacture.* The defendant also contends that his convictions of manufacture of methamphetamine, in violation of K.S.A. 65-4159, and possession of drug paraphernalia with intent to manufacture, in violation of K.S.A. 65-4152(a)(3), are multiplicitous because proof of the possession of drug manufacturing paraphernalia is necessary to prove manufacture of methamphetamine. Again, the evidence used to prove the offense is not relevant to the analysis. Instead, we examine the elements of the statutes.

A conviction for possession of drug paraphernalia shares a common element with a conviction for manufacturing methamphetamine, *i.e.,* the intent to manufacture. However, each offense proscribes other, distinct conduct. Compare K.S.A. 65-4159 with K.S.A. 65-4152. Therefore, the crimes are not multiplicitous and there is no double jeopardy violation. See *Patten,* 280 Kan. at 393.

*Possession of Ephedrine or Pseudoephedrine as a Precursor, Possession of Anhydrous Ammonia, and Possession of Drug Paraphernalia With Intent to Manufacture.* Finally, the defendant argues his convictions of possession of ephedrine or pseudoephedrine as a precursor in violation of K.S.A. 65-7006(a), possession of anhydrous ammonia in an unapproved container in violation of K.S.A. 65-4152(a)(4), and possession of drug paraphernalia with intent to manufacture in violation of K.S.A. 65-4152(a)(3) are multiplicitous. In support of this argument, the defendant contends that both ephedrine and anhydrous ammonia are products used for the manufacture of methamphetamine; therefore, they are also, by definition, drug paraphernalia which is possessed with the intent to manufacture.

The defendant cites *State v. Saling,* No. 88,894, unpublished Court of Appeals' opinion filed July 25, 2003, in support of his argument. According to the defendant, *Saling* approved a district court's finding that the crimes of possession of ephedrine and possession of drug paraphernalia with intent to manufacture are mul-

tiplicitous. In fact, the substantive issue of multiplicity was never argued or addressed in *Saling*; rather, the issue was whether the journal entry of sentencing correctly reflected the district court's ruling on multiplicity and the State conceded it did not. Thus, *Saling* does not support the defendant's argument.

The Court of Appeals panel in this case summarily disposed of Schoonover's argument as to the charge of possession of anhydrous ammonia. *Schoonover*, slip op. at 16. The panel had more difficulty, however, in resolving whether possession of ephedrine and possession of drug paraphernalia were multiplicitous. In discussing the overlap between ephedrine and possession of drug paraphernalia, the panel noted the holding of *State v. Frazier*, 30 Kan. App. 2d 398, 405, 42 P.3d 188, *rev. denied* 274 Kan. 1115 (2002), that possession of ephedrine and possession of drug paraphernalia are identical offenses because both offenses prohibit the possession of ephedrine for use in the manufacture of a controlled substance. However, the panel also noted that *Frazier's* reasoning had been criticized by Judge David S. Knudson in his concurring opinion in *Wilson v. State*, 31 Kan. App. 2d 728, 735, 71 P.3d 1180, *rev. denied* 276 Kan. 974 (2003), and that another Court of Appeals panel had declined to follow *Frazier* in *State v. Campbell*, 31 Kan. App. 2d 1123, 78 P.3d 1178 (2003), *rev'd in part* 279 Kan. 1, 106 P.3d 1129 (2005), a case which was then on petition for review before this court. The panel decided to reject *Frazier* and adopt the reasoning of Judge Knudson that the crimes of possession of ephedrine and possession of drug paraphernalia were not identical offenses. Thus, the panel concluded that the offenses were not multiplicitous. *Schoonover*, slip op. at 16-17.

After the Court of Appeals filed its decision in this case, this court issued its opinion in *State v. Campbell*, 279 Kan. 1, 106 P.3d 1129 (2005), reversing the Court of Appeals' decision in that case and essentially approving the reasoning of the Court of Appeals in *Frazier*. In *Campbell*, the court found the statutory provisions to be overlapping and, when applied to ephedrine, to be identical. Under those facts, both *Campbell* and *Frazier* applied the following sentencing rule: "Where two criminal offenses have identical elements but are classified differently for purposes of imposing a pen-

alty, a defendant convicted of either crime may be sentenced only under the lesser penalty provision." *Campbell*, 279 Kan. 1, Syl. ¶ 5; *Frazier*, 30 Kan. App. 2d 398, Syl. ¶ 6.

In *State v. Cherry*, 279 Kan. 535, 112 P.3d 224 (2005), we stated that the elements of K.S.A. 65-7006, possession of ephedrine, and K.S.A. 65-4152(a)(3), possession of drug paraphernalia with the intent to manufacture a controlled substance, were "overlapping rather than identical." *Cherry*, 279 Kan. at 541. K.S.A. 65-7006 requires proof of possession of ephedrine. K.S.A. 65-4152(a)(3) does not require proof of possession of ephedrine; it applies to possession of other paraphernalia as well. However, where the paraphernalia is ephedrine the provisions overlap.

The question raised is whether multiple convictions under overlapping provisions, the statutory infirmity at issue in those cases, violate the double jeopardy provisions of the United States and Kansas Constitutions. That question is discussed in *Ball v. United States*, 470 U.S. 856, 860 n.7, 84 L. Ed 2d 740, 105 S. Ct. 1668 (1985), a case which considered the double jeopardy implications raised by the holding *United States v. Batchelder*, 442 U.S. 114, 60 L. Ed. 2d 755, 99 S. Ct. 2198 (1979), a case discussed extensively and relied upon in *Campbell*. *Batchelder*, like *Campbell*, involved two statutes which overlapped in making similar or the same conduct illegal. Following *Batchelder*, some courts held a defendant could not be prosecuted under both statutes in a single prosecution. The United States Supreme Court rejected this interpretation, stating: "The Court had no intention of restricting the Government to prosecuting for only a single offense, an issue not before the Court. This is confirmed by *Batchelder's* conclusion that the two statutes are 'each fully enforceable on [their] own terms.' " 470 U.S. at 860 n.7. However, the Court indicated that while prosecution may not offend double jeopardy, punishment might. The Court stated that the legislative intent must be determined. To do so the Court applied the *Blockburger* test. The Court stressed that *Blockburger* is merely an aid to discern legislative intent; thus, even if the elements are the same the question is whether Congress intended two punishments. The Court reiterated the rule of lenity: "The assumption underlying the *Blockburger* rule is that Congress

ordinarily does not intend to punish the same offense under two different statutes." 470 U.S. at 861. After applying the test, the *Bell* Court determined that the legislative intent was to have only one conviction and sentence for either receipt of a firearm by a felon or possession of a firearm by a felon.

However, as *Ball* made clear, simply because the statutes overlap, there is not necessarily a double jeopardy violation. Consequently, we must apply the same-elements test to K.S.A. 65-7006, K.S.A. 65-4152(a)(3), and K.S.A. 65-4152(a)(4). Under a same-elements test, the statutes are not identical even though, as we explained in *Cherry*, the conduct may be the same. *Cherry*, 279 Kan. at 541 (possession of ephedrine and possession of drug paraphernalia statutes are "overlapping rather than identical"). K.S.A. 65-7006 requires proof of possession of ephedrine. K.S.A. 65-4152(a)(4) requires proof of possession of anhydrous ammonia in an unapproved container. K.S.A. 65-4152(a)(3) does not require proof of possession of either ephedrine or anhydrous ammonia and does not require proof of the type of container used for any item of drug paraphernalia. Thus, while the overlap gives rise to the special sentencing rule imposed in *Frazier*, *Campbell*, and other cases, there is not an identity of elements in the statute as must be shown under the double jeopardy rule.

Furthermore, under the Fifth Amendment analysis, the same-elements test is merely a tool to assist in determining legislative intent. Where the legislative intent is clear that there can be multiple punishments, there is no double jeopardy violation. *Batchelder*, 470 U.S. at 861. The legislative history of the ephedrine and paraphernalia provisions, which was discussed in *Campbell*, reveals an effort to seek new tools for prosecution and an attitude of severity and harshness in punishment. See 279 Kan. at 7-8. The same conclusion can be drawn from the legislature's separate enactment of provisions regarding possession of anhydrous ammonia in an unapproved container, especially because the legislation was directed to a separate evil: the safety issue involved in storing anhydrous ammonia in an unapproved container. The paraphernalia statute is designed to cover a broad spectrum of items, while the other statutes are directed to specific items and to separate evils.

Schoonover's convictions do not violate the Double Jeopardy Clause of the Fifth Amendment or § 10 of the Kansas Constitution Bill of Rights.

## II. Lesser Included Offenses of Manufacture of Methamphetamine

In a related argument, the defendant contends the trial court erred in failing to instruct the jury on possession of drug paraphernalia with intent to manufacture and possession of methamphetamine as lesser included offenses of manufacture of methamphetamine. The defendant did not request such instructions.

As noted by the Court of Appeals panel, where a defendant complains of error in the failure to give lesser included offense instructions but did not request such instructions, the appellate court will not reverse unless the failure to give the instructions was clearly erroneous. See *State v. Young*, 277 Kan. 588, 600, 87 P.3d 308 (2004).

In this case, the Court of Appeals concluded that possession of drug paraphernalia with intent to manufacture and possession of methamphetamine were not lesser included offenses of manufacture of methamphetamine because there was no identity of the elements between the offenses. Thus, the court found no error in the trial court's failure to give lesser included instructions. *Schoonover*, slip op. at 19.

As previously discussed, K.S.A. 2005 Supp. 21-3107 governs whether one offense is a lesser included offense of another. The portion of the statutory definition which applies to this issue states that "(b) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 2005 Supp. 21-3107(2). As seen in the discussion of the double jeopardy issue, the offenses of possession of drug paraphernalia with intent to manufacture and possession of methamphetamine do not contain elements which are identical to some or all of the elements of the offense of manufacture of methamphetamine and, therefore, neither is a lesser included offense of manufacture of methamphetamine. The trial court did not err in failing to give a lesser included offense instruction.

### III. Multiple Acts/Unanimity

The defendant also contends there were several factually different acts which the jury could have relied upon to convict him of possession of drug paraphernalia with intent to manufacture. He lists a variety of objects and substances found in his vehicle which could have served as the basis for his conviction and argues that several of the items found were paraphernalia for drug use and not manufacturing. Thus, defendant contends the trial court should have given the jury a multiple acts instruction to ensure unanimity.

The Court of Appeals panel rejected this argument, finding the defendant failed to allege how there were multiple acts which would have justified a unanimity instruction and finding the jury was clearly instructed that the paraphernalia necessary to convict defendant was that which is used in the "manufacturing" process. The court concluded there was no jury confusion on the evidence needed to convict defendant and the trial court did not err by failing to give a unanimity instruction. *Schoonover*, slip op. at 19-21.

Whether a case presents a multiple acts issue is a question of law over which this court has unlimited review. *Kesselring*, 279 Kan. at 682. We have applied a two-part "harmless error" test enunciated in *State v. Hill*, 271 Kan. 929, 939, 26 P.3d 1267 (2001), when analyzing unanimity issues. The first prong of the *Hill* harmless error test requires determination of whether there was jury confusion. As part of this analysis, it must be determined whether the evidence showed legally or factually separate incidents. In *Kesselring*, we clarified that the question of whether there were factually separate incidents should be a threshold question, not part of a harmless error analysis. Much like we must determine whether conduct is unitary for double jeopardy purposes, we must determine if there are multiple acts involved before considering whether the defendant's statutory right to a unanimous verdict has been violated. If the incidents are not factually separate, there are not multiple acts.

As we explained in *Kesselring*, " '[i]ncidents are factually separate when independent criminal acts have occurred at different

times or when a later criminal act is motivated by a "fresh impulse." ' " 279 Kan. at 683 (quoting *Hill,* 271 Kan. at 939). In addition, the other factors we have identified as factors for determining if there is unitary conduct can be applied as well. Thus, the considerations would include: (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.

The Court of Appeals panel in this case focused upon this question and determined there were not factually separate incidents involved. The defendant seeks review of this determination, contending that *State v. Kinmon,* 26 Kan. App. 2d 677, 995 P.2d 876 (1999), *abrogated on other grounds by State v. Hill,* 271 Kan. 929, Syl. ¶ 3, 26 P.3d 1267 (2001), controls. In *Kinmon,* the jury could have convicted the defendant based upon evidence of actual possession of cocaine found in his pocket or constructive possession of cocaine found under a couch. The *Kinmon* court ruled that jurors could have relied on different acts in deciding to convict the defendant, thus the failure to give a unanimity instruction required reversal of the defendant's conviction. 26 Kan. App. 2d at 678-79.

*Kinmon* was distinguished in *State v. Hazley,* 28 Kan. App. 2d 664, 19 P.3d 800 (2001), the case relied upon by the Court of Appeals panel in this case. In *Hazley,* the State charged the defendant with possession of methamphetamine and marijuana under the theory that she constructively possessed all the drugs found in various locations throughout her home. The defendant claimed the drugs belonged to someone else. The defendant argued that a unanimity instruction was required because the State failed to specify which items it was relying on to support each charge. The panel rejected her argument, distinguishing *Kinmon,* and holding:

"Hazley urges us to hold that *State v. Kinmon,* 26 Kan. App. 2d 677, 995 P.2d 876 (1999), controls this issue. In that case, [the] weight of the State's evidence was that the defendant possessed cocaine in two places: in his pocket and under a couch. The first would constitute actual possession and the second constructive possession. Because either factually and legally distinct act could have supported the crime charged, we ruled that the trial judge committed error by failing to

instruct the members of the jury that they must agree unanimously on which act was proved by the State. 26 Kan. App. 2d at 678-79.

"We do not find *Kinmon* controlling. In this case, the State pursued convictions only on a constructive possession theory for drugs found simultaneously throughout the house in which Hazley lived. On the methamphetamine count, for example, Hazley was accused of constructively possessing *all* of the methamphetamine in her house. The same was true of the marijuana count. There were no truly multiple acts on which the prosecution relied and thus there was no need for a unanimity instruction." 28 Kan. App. 2d at 671.

The facts of this case are more akin to *Hazley* than *Kinmon*. As in *Hazley*, this case is one involving multiple items of evidence but not factually distinct, *i.e.*, multiple, acts. The State alleged that the defendant possessed all of the drug paraphernalia found in his vehicle. Thus, there was no need for the State to specify which particular piece of paraphernalia it was relying upon and no need for the trial court to give a unanimity instruction; it was possession of all of the drug paraphernalia which was at issue.

The defendant also argues that the jury could have convicted him based on paraphernalia which was intended for drug use rather than drug manufacture. However, as the State points out in its brief, Detective Frazier testified about the specific use of each piece of drug paraphernalia found. Frazier explained that the forceps, rolling papers, and small glass "snort" tube were all used to ingest or inhale drugs, rather than being used in the manufacturing process.

The Court of Appeals resolved this argument by noting that Instruction No. 5 clearly informed the jury that the paraphernalia necessary to convict defendant was that which is used in the "manufacturing" process. Instruction No. 5 defined drug paraphernalia as follows:

" 'Drug paraphernalia' means all equipment, products and materials of any kind which are used or intended for use in manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing or containing a controlled substance in violation of the Uniform Controlled Substances act.

" 'Drug paraphernalia' shall include, but is not limited to:

(1) Kits used or intended for use in manufacturing, compounding, converting, producing, processing or preparing controlled substances;

(2) Scales and balances used or intended for use in weighing or measuring controlled substances;

(3) Blenders, bowls, containers, spoons and mixing devices used or intended for use in compounding controlled substances." (Emphasis added.)

Thus, the jury was not instructed that it could convict the defendant based on any drug paraphernalia intended for use to ingest or inhale drugs.

## IV. Drug Tax Stamps/Opportunity to Affix

Next, the defendant argues the evidence was insufficient to support his conviction of possession of methamphetamine without the appropriate drug tax stamp because there was no evidence that defendant had been in possession of the methamphetamine long enough to have had a reasonable opportunity to affix the stamps. In support, he cites *State v. Edwards*, 27 Kan. App. 2d 754, 762, 9 P.3d 568 (2000), which held that "a defendant may not be found guilty of a crime for failing to affix tax stamps to a controlled substance unless the evidence shows that the defendant had sufficient possession so that he or she had an opportunity to affix those stamps."

The Court of Appeals panel in this case rejected the defendant's argument, finding the reasoning of *State v. Alvarez*, 29 Kan. App. 2d 368, 372, 28 P.3d 404, *rev. denied* 272 Kan. 1419 (2001), and *State v. Curry*, 29 Kan. App. 2d 392, 28 P.3d 1019, *rev. denied* 272 Kan. 1420 (2001), to be more persuasive. *Alvarez* relied on K.S.A. 79-5204(c), which requires that a dealer affix a drug tax stamp "immediately after receiving the substance," in holding that there is no grace period to purchase and affix a drug tax stamp. 29 Kan. App. 2d at 372. *Curry* similarly held: "Evidence that a defendant had actual possession of a controlled substance or possession with sufficient control to permit the immediate affixing of drug tax stamps is sufficient to support a conviction under K.S.A. 79-5208." 29 Kan. App. 2d 392, Syl. ¶ 4.

This court has not previously addressed the conflict between the *Edwards* opinion and the *Alvarez* and *Curry* opinions.

*Edwards* relied upon another Court of Appeals opinion, *In re Burrell*, 22 Kan. App. 2d 109, 912 P.2d 187, *rev. denied* 260 Kan.

993 (1996). *Burrell* was a civil taxation action where the Kansas Department of Revenue had assessed taxes and penalties on the defendant's possession of marijuana. The defendant had been arrested by an undercover officer immediately after the officer put marijuana purchased by the defendant into the defendant's car. The defendant never had actual, physical custody of the marijuana, only constructive possession. The *Burrell* panel agreed with the Board of Tax Appeals that the defendant's possession was insufficient to incur tax liability, reasoning that imposing criminal liability for failure to pay the drug tax would be unconstitutional "if it were based on conduct that gave the violator no opportunity to comply with the law." 22 Kan. App. 2d at 116-17.

*Edwards* then applied *Burrell* in the criminal context, but expanded it to require that a defendant be in possession of a controlled substance *"for a period of time* sufficient for the defendant to have affixed the stamps to the substance." (Emphasis added.) *Edwards*, 27 Kan. App. 2d 754, Syl. ¶ 5.

The *Alvarez* panel rejected the *Edwards* analysis because it "failed to mention K.S.A. 79-5204(c), which requires that a dealer affix a drug tax stamp 'immediately after receiving the substance.' " *Alvarez*, 29 Kan. App. 2d at 372.

The *Curry* panel went one step further and stated that *Edwards* has misapplied *Burrell* by suggesting that the sufficiency of possession was a function of time:

"Under the facts in *Burrell*, the *constructive* possession, if it was such, did not allow any opportunity for the dealer to affix drug tax stamps. If a dealer's control over drugs is so tenuous as to preclude any opportunity to affix drug tax stamps, such constructive possession will not constitutionally support a conviction for possessing drugs without affixing drug tax stamps. *Edwards* would suggest the determination of what constitutes 'sufficient possession' to avoid constitutional challenge is a function of time; the dealer must be allowed some amount of time to affix the stamps. However, the legislature has established the time that drug stamps are to be affixed, *i.e.*, immediately. . . . K.S.A. 79-5208 does not permit any grace period. The tax is due and payable, and tax stamps must be affixed immediately upon receipt, acquisition, or possession of the cocaine.

"We feel *Edwards'* suggestion that sufficiency of possession under K.S.A. 79-5208 is a function of time does not comport with the legislative intent of K.S.A. 79-5204(c). What made the possession in *Burrell* constitutionally suspect was Burrell's lack of control over the drugs." *Curry*, 29 Kan. App. 2d at 398.

The *Curry* panel concluded that the relevant analysis was not whether the defendant had possession of the drugs for a sufficient period of time to affix drug tax stamps, but whether he had "actual possession or possession with sufficient control over the drugs to permit the immediate affixing of drug tax stamps." 29 Kan. App. 2d at 399.

The rationales of *Alvarez* and *Curry* are persuasive. Under K.S.A. 79-5204(c) and (d), the drug tax is due and payable, and drug tax stamps must be affixed immediately upon receipt, acquisition, or possession of the controlled substance. In this case, there was no issue of constructive possession. The defendant had actual possession and sufficient control over the methamphetamine found in the cooler to permit his immediately affixing drug tax stamps as required by K.S.A. 79-5204(c) and (d). The defendant was the only person in the vehicle and, as noted by the Court of Appeals, he was found with a Bud Ice beer bottle sitting between his legs, a brand of beer identical to that found in the same cooler with the methamphetamine. *Schoonover*, slip op. at 23. Under these circumstances, the evidence was sufficient to support the defendant's conviction for possession of methamphetamine without the appropriate tax stamp.

The defendant also contends that the methamphetamine was not yet in usable form and there was no evidence as to whether the weight of the methamphetamine in its final form would have been enough to require tax stamps to be affixed. The Court of Appeals rejected this argument, noting that the Kansas Bureau of Investigation (KBI) chemist testified that the net weight of the methamphetamine found in the cooler was 26.46 grams. *Schoonover*, slip op. at 23.

The State contends that a drug need not be in usable form to be considered an illegal substance under the Uniform Controlled Substances Act, citing *State v. Brown*, 245 Kan. 604, 783 P.2d 1278 (1989). However, *Brown* held that proof of the possession of any *amount* of a controlled substance, whether or not that *amount* is measurable or usable, is sufficient to sustain a conviction for possession. 245 Kan. at 613-14. *Brown* did not hold that a drug need not be in usable form, only that it need not be in a usable amount.

Nonetheless, the Court of Appeals panel in this case ruled correctly on this issue. K.S.A. 79-5202 imposes a drug tax on "each gram of a controlled substance." Controlled substance means any drug or substance defined by K.S.A. 65-4101(e). K.S.A. 79-5201(b). Controlled substance is not defined based on whether a drug is in usable form or not. In fact, for purposes of this case, controlled substance is defined as "[a]ny material, compound, mixture, or preparation which contains any quantity of [methamphetamine]." K.S.A. 65-4107(d)(3); 65-4101(e).

The KBI chemist testified the substance in the jar was methamphetamine, which is a controlled substance. Thus, the evidence was sufficient to sustain the defendant's conviction of possession of methamphetamine without affixing a drug tax stamp.

### V. Drug Tax Stamp Instruction

In a related argument, the defendant contends the trial court erred in failing to instruct the jury that, in order to convict defendant of possession of methamphetamine without affixing drug tax stamps, it must find defendant had the opportunity to affix the stamps. Again, the defendant relies on *State v. Edwards* for the proposition that opportunity to affix the stamps is an element of the crime.

The defendant did not request such an instruction at trial; therefore, this court reviews the issue under a clearly erroneous standard. *State v. Pabst*, 273 Kan. 658, 660, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002).

The Court of Appeals panel in this case relied on *Alvarez* and *Curry* in rejecting the defendant's argument. The panel followed the holding of *Curry*:

" 'Where the evidence will support a jury finding that a defendant had actual possession of a controlled substance or possession with sufficient control to allow any opportunity to immediately affix drug tax stamps to the drugs, it is not clearly erroneous for the district court to fail to give an instruction, *sua sponte*, requiring the jury to find defendant had sufficient possession of the drug to allow defendant an opportunity to affix the drug tax stamps.' " *Schoonover*, slip op. at 24 (quoting *Curry*, 29 Kan. App. 2d 392, Syl. ¶ 3).

As discussed in the preceding issue, the *Curry* analysis is more persuasive than *Edwards*. In this case, where the defendant clearly had sufficient possession and control over the methamphetamine found in the cooler to permit his immediately affixing drug tax stamps, the trial court did not err in failing to instruct the jury that the defendant must have had an opportunity to affix the drug tax stamps.

The jury in this case was instructed on the definition of possession as provided in PIK 3d 67.13-D. The PIK instruction, which focuses on control, was sufficient. See *Curry*, 29 Kan. App. 2d at 398. There was no error in the instruction.

### VI. *Search Warrant Affidavit/Reasonableness of Search*

Defendant's next three arguments involve the validity of the search warrant. First, defendant contends the material omission of facts from the affidavit in support of the search warrant rendered the subsequent search of his vehicle unreasonable under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights.

A defendant generally may not dispute the matters alleged in an affidavit in support of a search warrant. However, an exception exists where the defendant shows by a sworn allegation that the application for a search warrant contains: (1) material statements of deliberate falsehood or reckless disregard for the truth that were necessary to find probable cause or (2) deliberate omissions of material fact. *State v. Hendricks*, 31 Kan. App. 2d 138, 141, 61 P.3d 722 (2003). Where an affidavit in support of a search warrant omits information, the trial court and appellate court must determine whether the omission was material and whether the omission rendered the application and affidavit unreliable. *Littrice v. State*, 31 Kan. App. 2d 846, 850, 75 P.3d 292 (2003). Omissions in an affidavit in support of a search warrant will not render the warrant invalid if the affidavit, even with the omitted material added to it, established sufficient probable cause to issue the warrant. *State v. Colbert*, 257 Kan. 896, 907, 896 P.2d 1089 (1995).

The affidavit in support of the search warrant was prepared by Detective Frazier. According to the affidavit, upon arriving at the

scene, Frazier spoke with Captain Hoffman who told him that Schoonover had been found slumped over the wheel of his vehicle. Hoffman told Frazier he had smelled anhydrous ammonia coming from the vehicle and seen a package of coffee filters in the front seat and a cooler on the floor. Frazier observed a Coleman fuel can in the rear hatchback area of the vehicle. Frazier knew from his training and experience that anhydrous ammonia, Coleman fuel, and coffee filters are all used in the manufacture of methamphetamine. Frazier also knew Schoonover had been previously arrested for possession of methamphetamine with intent to distribute in 1996 and for manufacturing a controlled substance in 2001.

The defendant contends that, in making the affidavit, Detective Frazier failed to mention that the car was full of various items including fishing and camping gear, facts which negated any probable cause related to the coffee filters or Coleman fuel. Defendant also complains that Frazier failed to mention that two civilian witnesses did not notice any odor of anhydrous ammonia coming from the vehicle, facts which negated the claim that officers smelled anhydrous ammonia.

The trial court denied the defendant's motion to suppress, finding that if all of the information complained of by the defendant had been included in the affidavit, the result would have been the same, *i.e.*, there still would have been probable cause to search the vehicle.

The Court of Appeals panel in this case also rejected the defendant's argument, finding that the affidavit contained no material omissions. With regard to defendant's first argument, the panel found no authority for requiring the officer to include in the affidavit every single item he was able to see inside the vehicle. As to defendant's second argument, the panel found no evidence that Detective Frazier was even aware that the two civilian witnesses had not smelled anhydrous ammonia coming from the vehicle, nor was Frazier required to ask every potential witness whether he or she had smelled ammonia coming from the vehicle. *Schoonover*, slip op. at 26-27.

Essentially, both the trial court and Court of Appeals panel found that any omissions in the affidavit were not material. Al-

though each phrased its ruling differently, each ruling is sound and the defendant has not offered a persuasive argument for reversal.

Furthermore, the Court of Appeals panel also found that officers would have been justified in searching defendant's vehicle without a warrant because the smell of anhydrous ammonia coupled with the officers' observation of coffee filters and Coleman fuel would have provided probable cause, or the search could have been justified as a search incident to a lawful arrest. *Schoonover*, slip op. at 27-28. In finding that the search would have been justified even without a warrant based on the odor of anhydrous ammonia, the Court of Appeals cited *State v. MacDonald*, 253 Kan. 320, 325, 856 P.2d 116 (1993), which held that the odor of marijuana alone provided probable cause for a vehicle search. The Court of Appeals reasoned: "If the odor of fresh marijuana provides probable cause for a vehicle search, it follows that the smell of anhydrous ammonia by trained police officers may contribute to a finding of probable cause as well." *Schoonover*, slip op. at 27. The Court of Appeals failed to distinguish between the plain smell of an illegal substance and the plain smell of a legal substance such as anhydrous ammonia. However, the smell of anhydrous ammonia in an automobile may create probable cause to believe that anhydrous ammonia is not being stored in a legal container as required by law. Furthermore, the smell when combined with other factors could provide probable cause. *United States v. Lopez*, 777 F.2d 543, 551 (10th Cir. 1985) (the odor of a legal substance, "an ether-like substance," in combination with other circumstances gave officers probable cause to search a vehicle).

Additionally, the Court of Appeals panel in this case held that the search could have been justified as a search incident to a lawful arrest. The panel stated:

"Schoonover was initially placed under arrest by Langdon for transporting an open container after he was removed from the vehicle. Thus, the police would have been justified in searching the passenger compartment of the vehicle pursuant to K.S.A. 22-2501 . . . .

"In their search for additional alcohol as evidence of the open container crime, the police would have certainly looked inside the cooler. Since the cooler contained the methamphetamine, the search of the entire vehicle could have proceeded from that point." *Schoonover*, slip op. at 27-28.

This conclusion is sound.

## VII. *Neutral and Detached Magistrate*

Next, the defendant contends that the judge who issued the search warrant was not a neutral and detached magistrate because he had previously represented the defendant in both domestic and criminal matters and because the judge had referred to the defendant and one of his associates as "low lifes" in a conversation with another client. According to the defendant, the judge's personal knowledge of the defendant influenced his probable cause determination such that he could not act as a neutral and detached magistrate.

David Shriver, acting as pro tem district court judge, signed the search warrant for the defendant's vehicle. The defendant testified at the suppression hearing that Shriver had previously represented him in a divorce proceeding and in a criminal case involving possession of marijuana in 1983 and that the defendant had discussed his drug use in detail with Shriver at that time. The defendant maintained that he contacted Shriver again in 1998 about a child custody matter and that Shriver remembered him.

Shriver testified that he recalled representing the defendant in the divorce proceeding but did not recall representing him in the criminal case, although he did not dispute that could have been true. Shriver admitted that, at the time he signed the warrant, he recognized the defendant's name; however, he stated he had no preconceived notions about whether the defendant had previously been involved with drug activity.

The defendant also presented the testimony of Demilla Hewitt who testified that she contacted Shriver for legal advice in early 2001. Hewitt had found drug paraphernalia in a home she had allowed the defendant and another man, Earl Saling, to live in, and she wanted to know what she should do with it. Shriver asked her, "Why are you letting these kind of low lifes stay in your house?"

Shriver testified that he remembered having a conversation with Hewitt about the situation in her house but he only recalled the mention of Saling's name and not the defendant's. He stated the

conversation played no role in his decision to sign the search warrant.

The trial court denied the defendant's motion to suppress, ruling that Shriver was a neutral and detached magistrate and that he was not influenced by his prior contacts with the defendant or his conversation with Hewitt. Specifically, the court stated that it believed Shriver's testimony that he did not remember previously representing the defendant in a criminal case.

When reviewing a motion to suppress evidence, the appellate court reviews the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. The appellate court does not reweigh the evidence. *State v. Jones*, 279 Kan. 71, 73, 106 P.3d 1 (2005).

The Court of Appeals panel in this case ruled that the trial court's findings were supported by substantial competent evidence, since the contacts between the defendant and Shriver took place almost 20 years before the search. *Schoonover*, slip op. at 30.

Furthermore, the trial court clearly found Shriver's testimony that his judgment was not affected by any prior knowledge of or prior contact with the defendant to be credible. That credibility determination must not be disturbed on appeal. *State v. Hardyway*, 264 Kan. 451, 456, 958 P.2d 618 (1998) (at hearing on motion to suppress, credibility of witnesses and weight to be given evidence are matters to be determined by trial court).

Given Shriver's testimony, there was substantial competent evidence to support the trial court's finding that Shriver acted as a neutral and detached magistrate. As stated by the Indiana Court of Appeals, "[t]he requirement that a warrant must be issued by a neutral and detached magistrate does not equate to a constitutional mandate requiring that a judge have no contact with or knowledge of the case or the defendant." *Green v. State*, 676 N.E.2d 755, 761 (Ind. App. 1996). Thus, the trial court did not err in denying the defendant's motion to suppress on that ground.

### VIII. *Scope of Warrant*

Next, the defendant contends that officers exceeded the scope

of the search warrant. The Court of Appeals panel in this case refused to consider this issue on the ground it was never raised before the trial court. *Schoonover*, slip op. at 31. On review, defendant points to a handwritten, pro se "Motion to Dismiss" which includes the statement: "The result of the search went way beyond [the] scope of [the] search warrant." We will, therefore, consider the merits of his argument.

The search warrant stated there was probable cause to believe the offenses of possession of anhydrous ammonia in an unapproved container and felony possession of drug paraphernalia had been committed and authorized officers to seize anhydrous ammonia, coffee filters, Coleman fuel, and an insulated Igloo cooler as evidence of these offenses. Officers seized over 40 items from the defendant's vehicle, including various items of drug paraphernalia as well as a pill bottle containing a white powder which turned out to be ephedrine and a plastic bag containing a green leafy substance which turned out to be marijuana.

The defendant's argument seems to be that the searching officers only had the authority to enter the car to seize the exact items listed in the search warrant and could not look into containers such as the defendant's duffel bag for further evidence of the suspected offenses. That is clearly not the law. When a lawful search is conducted pursuant to a warrant, officers may open a container such as a duffle bag if the object of their search could be found inside. See *State v. Yardley*, 267 Kan. 37, 41, 978 P.2d 886 (1999).

Furthermore, all of the items seized by the officers in executing the search warrant had a logical nexus with the items listed in the warrant, thus the unnamed items were admissible. See *United States v. Gentry*, 642 F.2d 385, 387 (10th Cir. 1981) ("When a logical nexus exists between seized but unnamed items and those items listed in the warrant, the unnamed items are admissible.").

## IX. Cumulative Error

The defendant's final argument is that the cumulative effect of multiple errors denied him a fair trial. Multiple trial errors may require reversal of a defendant's conviction if the cumulative effect of the errors substantially prejudiced the defendant and denied

him a fair trial. No prejudicial error may be found if the evidence against the defendant was overwhelming. *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 (1992). Because there was no error in this case, this issue has no merit.

Affirmed.

LOCKETT, J., Retired, assigned.